[No. S060803. Aug. 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN MUNGIA, Defendant and Appellant.

1102

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Jeffrey Gale, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Lise Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant John Mungia of the first degree murder of Alma Franklin. (Pen. Code, §§ 187, 189; all further statutory references are to the Penal Code unless otherwise indicated.) It found true special circumstance allegations that the murder was committed while defendant was engaged in the commission of robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)) and burglary (§ 190.2, former

subd. (a)(17)(vii), now subd. (a)(17)(G)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). At the penalty phase, the jury returned a verdict of death.

After defendant waived a jury trial on the issue, the trial court found true the allegations that defendant had previously been convicted, within the meaning of section 667, subdivisions (c) and (e), of attempted murder (§§ 187, 664), mayhem (§ 203), and three counts of robbery (§ 211). The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death; in light of the death sentence, no sentence enhancements were imposed for the prior convictions.

This appeal is automatic. (§ 1239, subd. (b).) We vacate the torture-murder special-circumstance finding, but otherwise affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

In October 1993, defendant moved into a trailer beside the house of his sister, Cynthia Mungia, in Riverside. Cynthia lived across the street from 73-year-old murder victim Alma Franklin. After moving in, defendant told Cynthia that if he ever committed another robbery, he would have to kill the victim to avoid being identified.

On April 11, 1994, Franklin placed a television set on the street to be picked up as trash. Defendant asked her if the television worked; when she replied it did not, defendant said he wanted a part from it.

On April 12, 1994, between 4:00 and 4:30 p.m., defendant asked Cynthia for money. Cynthia refused to give him any and left to go to the store. As she was leaving, she saw Franklin in front of her house. Cynthia returned, but she departed again around 5:15 p.m. for her weekly bingo game. Although defendant occasionally accompanied Cynthia to the bingo game, he did not do so on this occasion. William Mills (Cynthia's next-door neighbor), Kenneth Wilde (Franklin's next-door neighbor), and Melissa DeAnda (a friend of defendant's nephew, Alex Mungia) each also saw Franklin in front of her house from around 5:00 p.m. to 7:00 p.m. Around 7:00 p.m., Wilde heard defendant ask Franklin if she needed help putting empty tar buckets on the curb for trash collection, and Franklin said she did not.

Around 7:15 p.m., Manuel Lopez III (hereafter Lopez), who lived on the same street as murder victim Franklin and defendant, heard a car coming quickly down the street. Lopez and his father went to the street to yell at the driver to slow down; they were surprised when they saw the car was Franklin's. Lopez considered Franklin a cautious driver, and he had never seen her allow anyone else to drive her car. Lopez's father thought the driver was Paul McAllister, Franklin's boyfriend.

Around 9:15 p.m., Wilde heard a loud noise outside and called Franklin to ask if she had heard the noise. No one answered the telephone.

On the morning of April 13, 1994, Mills saw Alex Mungia feeding the chickens in Cynthia's backyard, a job ordinarily performed by defendant. Later that day, around 4:00 or 5:00 p.m., Melissa DeAnda, who was selling candy to raise money for a school trip, went to Franklin's house. Franklin's front door was open. Through the closed screen door, DeAnda could see Franklin lying on the living room floor. DeAnda ran across the street to Cynthia's house and told Cynthia what she had seen. Cynthia ran to Franklin's house and saw Franklin's garage door was open and her car was gone. Cynthia entered Franklin's home and saw that Franklin's face was "gashed" in.

Cynthia ran to Mills's house and told him that Franklin was "down in the front room." Mills went over to Franklin's house, determined that she was dead, and told Cynthia to tell his wife to call 911. After doing so, Cynthia went back to her house, checked defendant's trailer, and found no one there.

Riverside Police Officer Heath Baker and his partner responded to the 911 call. Baker saw Franklin lying on the living room floor with her feet bound together by a white sock and her wrists bound in the same manner. Because of the manner in which the blood had soaked the sock around Franklin's wrists, Riverside Police Detective George Callow, the lead crime scene investigator, concluded the sock had been tied around Franklin's wrists before she started to bleed. Callow also observed damage to Franklin's fingernails, which had blood around them.

Callow noted bloodstains on the bookshelf, on the wall between the bookshelf and coffee table, and on the chair near Franklin. The water in one of Franklin's toilets was red. In the master bedroom several dresser drawers were partially open, and clothing was scattered about the floor. A sheath knife was in the bedroom. The lower doors of a hallway linen closet were open and the closet appeared to have been searched. Franklin's wallet, her watch, and several pieces of her jewelry were missing. There were no signs of forced entry.

Lopez told Riverside Police Detective Gary DeVinna that he had seen someone driving Franklin's car the night before. He described the driver having very short, white hair. Defendant's hair was normally longer and darker than that of Paul McAllister (Franklin's boyfriend, who Lopez's father thought was the driver of her car), but defendant had his hair cut during the first week of April 1994.

When Riverside Police Sergeant Daniel Horton noticed the open garage door and the absence of a car, he reported to the National Crime Information Center that Franklin's car was stolen and wanted in connection with a homicide. About 9:30 p.m., Santa Ana Police Officer Jim Berwanger discovered Franklin's car on the 1300 block of South King Street in Santa Ana. Because the car was wanted in connection with a homicide investigation, Berwanger had it impounded. Around 11:00 p.m., Detective DeVinna spoke with Cynthia and her mother; defendant was not in his trailer next to Cynthia's house.

On April 14, 1994, Lopez told Detective DeVinna that he believed Paul McAllister, Franklin's boyfriend, was the man he had seen driving Franklin's car on the night of the murder. But when shown a photographic lineup that included a picture of McAllister, Lopez was not able to identify him. DeVinna also showed him a photographic lineup that included a picture of defendant with long hair; Lopez identified defendant but said he was not the driver of Franklin's car because the driver had short hair. At the time, he did not know that defendant had had his hair cut a week before Franklin's murder.

Detective DeVinna and his partner then talked to defendant. After defendant was told of, and waived, his constitutional rights to remain silent and to have a lawyer present, defendant said he was in his trailer the night of April 12. DeVinna and his partner asked defendant to remove his shirt. Defendant had superficial scratches on his chest, which he said were itch scratches. Defendant told DeVinna that on April 13 he looked for employment, rode around on a bus, went to a park and a mall, and finally went to the house of his cousin, Peggy Chairez, where he spent the night. Chairez's daughter confirmed that defendant had spent the evening of April 13 at Chairez's house.

On April 20, 1994, California Department of Justice Senior Criminalist Ricci Cooksey processed Franklin's car for evidence. Cooksey recovered a gray hair similar to Franklin's from the front passenger carpet mat; the hair was covered with a red substance that tested presumptively positive for blood. Two fingerprints lifted by Cooksey from the passenger side of the front bumper were later matched as defendant's prints by California Department of Justice Latent Print Analyst Donna Mambretti. Riverside Police

Service Representative Richard Greenwood also collected a pair of unmatched cufflinks, a silver-colored pillbox, and a pearl tie pin from the floorboard area of the passenger compartment. Cooksey also recovered from the car's interior a Marlboro cigarette butt that had lipstick on it. Franklin did not smoke; defendant smoked Camel brand cigarettes.

On April 26, 1994, DeVinna and his partner again talked to defendant. Defendant told DeVinna he used to live in Santa Ana but no longer knew anyone who lived there. Defendant denied ever having been in Franklin's house, garage, or car, and claimed he had never worked on or touched her car. Defendant told DeVinna the only time he had ever spoken to Franklin was about the television set.

On May 4, 1994, Lopez spoke with his landlord, John Smothers. Smothers showed him defendant's photograph, which had appeared in that day's newspaper; defendant had short hair in the picture. After looking at the photograph, Lopez concluded that defendant, not Paul McAllister, was the man he had seen driving Franklin's car on the day of the murder. Over a year later, on July 20, 1995, Lopez was shown a photographic lineup and identified defendant as the driver of Franklin's car.

On August 18, 1995, while defendant was serving a prison term on an unrelated matter, Riverside County District Attorney Investigator Terry Fischer executed a search warrant for defendant's personal property. On the property receipt issued by the prison to defendant, Fischer noted that "Betty" and "0 (714) 547-2303" had been handwritten in the top right corner, and that "Betty," "Carlos Angulo, Jr.," and an address on South Fairview in Santa Ana had been handwritten in the bottom left corner. Riverside County Sheriff's Detective J.D. Purkiss, a documents and handwriting expert, identified the handwriting on the paper as defendant's.

Fischer determined Elizabeth Arreguin was defendant's aunt, "Betty" was her nickname, and Angulo was her son (and defendant's cousin). According to the telephone company's records, "(714) 547-2303" was the unlisted number for Arreguin's telephone at the South Fairview address handwritten on defendant's property receipt.

Franklin's last phone bill showed that on April 12, 1994, at 6:34 p.m., a call was placed from her house to Arreguin's apartment. Franklin's personal phone book contained no listings for a telephone number with a 714 area code, or the names Elizabeth Arreguin or Betty Arreguin.

From April to July 1994, Arreguin and Angulo lived in an apartment on South Fairview, about four-fifths of a mile from where Officer Jim Berwanger recovered Franklin's car. While Arreguin and Angulo were living on South Fairview, defendant unexpectedly showed up one night and spent the night on the sofa. At trial, Arreguin could not recall the exact date that defendant stayed at her apartment, but she remembered that shortly after that visit, defendant had called her once and said he was in custody. Collect calls were made from the men's prison in Chino, where defendant was incarcerated, to Arreguin's number on April 30, 1994, and May 2, 1994.

Dr. Darryl Garber, a pathologist, performed an autopsy on Franklin's body. Franklin had been struck 23 times in the head and face, and there were four significant injuries to her face. Dr. Garber was unable to estimate the time of death, but he determined the cause to be craniocerebral injuries due to blunt force trauma. Franklin's body had defensive wounds on the back of her left hand, faint ligature furrows on both wrists, an abrasion on her right shoulder, and bruises on her left arm and shoulder. Dr. Garber could not determine whether the ligatures were applied before or after Franklin's death. Although the first blow may have knocked Franklin unconscious, her defensive wounds suggested she had remained conscious for a period of time. Dr. Garber noted Franklin had thick lacerations on the left side of her head in different directions, which indicated they were "inflicted in a frenzy almost" (that is, she received "a lot of blows in a short period of time"), and characterized her injuries as extremely painful and some of the most brutal that he had ever seen.

San Bernardino County Sheriff-Coroner's Department criminalist Donald Jones examined Franklin's fingernails for DNA evidence. A polymerase chain reaction test of genetic material recovered from fingernail fragments from Franklin's right hand eliminated Paul McAllister, but not defendant, as a suspect. All genetic material analyzed by Jones that was foreign to Franklin was consistent with defendant's. One in 320 Caucasians, one in 940 Hispanics, and one in 1,300 African-Americans have a DNA profile similar to defendant's.

Over defendant's objection, the prosecutor presented evidence of a prior robbery to show a common plan or scheme and to prove defendant's intent. Santa Ana Police Officer William Hill investigated the May 4, 1983 robbery of a Tastee Doughnut Shop employee, Micaela Partida, and the attempted murder of the shop's owner, Carl Shepard. After waiving his constitutional rights to remain silent and to have a lawyer present, defendant denied being at the doughnut shop, instead telling Hill he was at a park during the day and spent that night with a woman whom he had met in a bar. Hill later learned defendant actually had spent that night in his usual residence, the home of his grandmother and uncle.

Detective J.D. Purkiss identified defendant's signature on a redacted guilty plea form on which was written, "On 5-4-83 in Orange County I assaulted Micaela Partida and Carl Shepard with a knife. I took money from the immediate presence of Micaela Partida by force and fear and attempted to murder Carl Shepard by stabbing him in the left eye and right arm with a knife. Dated 9-12-83, Johnny Mungia."

### 2. Defense evidence

Defendant presented no evidence during the guilt phase.

## B. Penalty Phase

### 1. Prosecution evidence

#### (a) The Tastee Doughnut Shop robbery (§ 190.3, factors (b), (c))

While Micaela Partida was working as a cashier at the Tastee Doughnut Shop, defendant entered the shop through the back door. Partida told defendant to leave, so he did. A minute or two later, defendant entered the shop through the front door, talked to another customer, left and returned again, and played a video game. Defendant then went to the counter near the cash register and asked for a cup of coffee. When Partida told him that a cup of coffee was 35 cents, defendant said he lost his only quarter in the video game machine. Defendant later returned to the counter area and said, "I'm going to do a robbery." He drew a knife, jumped over the counter, opened the cash register, and started taking money out of it. Partida fled across the street.

Carl Shepard was in the kitchen area when defendant entered from the front of the doughnut shop. Defendant charged Shepard, who threw a baking sheet at him. Defendant then stabbed Shepard; the blade entered Shepard's left eye and exited through the roof of his mouth. Defendant withdrew the knife, stabbed Shepard in the bicep of his right arm, and ran out the back door of the shop.

On October 13, 1984, defendant pleaded guilty to mayhem, robbery, attempted murder, and two counts of assault with a deadly weapon.

After the robbery, Partida stopped trusting people, could not get defendant out of her mind, and sought therapy. She could no longer work because she could not trust people, and she believed the trauma from the robbery prevented her from being a good mother.

(b) *Other prior criminal activity resulting in felony convictions (§ 190.3, factors (b), (c))*

On June 27, 1976, defendant burglarized a Santa Ana home by entering through a window. On November 21, 1976, defendant pleaded guilty to burglary.

On July 9, 1977, defendant robbed an employee and a customer of a Winchell's Doughnut House in Santa Ana, taking money, doughnuts, and the customer's purse. Defendant told the employee not to call the police or he would "kill" or "get" her, and told the customer he would shoot her if she did not give him the purse. On August 23, 1977, defendant pleaded guilty to robbery.

On July 10, 1977, defendant drew a butcher knife on an employee of the Greenville Market in Santa Ana, twice hit him with the butt of the knife, and said, "Give me the money or I'll stab you." The employee gave defendant the money out of the cash register and two packages of cigarettes. On August 23, 1977, defendant pleaded guilty to robbery.

On October 27, 1979, defendant and a confederate robbed the U'Totem Market in Santa Ana. Defendant approached the manager with a knife and took the manager's wallet and money from the cash register. On January 21, 1980, defendant pleaded guilty to robbery with the use of a knife.

(c) *Other prior criminal activity (§ 190.3, factor (b))*

On March 11, 1975, defendant knocked on the front door of an elderly woman's house and asked if he could use the telephone. The woman refused, quarreled with defendant, and shut the door. Defendant pulled out a pellet gun, placed it against the glass window in the door, and fired into the house.

(d) *Victim impact testimony (§ 190.3, factor (a))*

Lois Hamilton, a friend of murder victim Franklin, described Franklin as an active church member who took great pride in her home and yard and was "a very loving, caring person" who never got upset with anyone. Jeanne Bell, one of Franklin's nieces, described Franklin as "close" to her nieces and nephews. Bell spoke with Franklin at least weekly. Franklin helped Bell after Bell's mother died in 1989 and her father died the following year, and they grew even closer. Franklin was in good health and walked daily before her murder.

2. *Defense evidence*

Dr. James Bartley, a clinical geneticist, examined defendant and determined he had Klinefelter's syndrome, a chromosomal abnormality in which a

male has two X and one Y chromosomes. A male with Klinefelter's syndrome often has some developmental delays, but usually catches up with his peers as an adult. The physical characteristics of Klinefelter's syndrome include increased breast tissue during puberty, lower testosterone levels, and smaller testes. Dr. Bartley found defendant had normal language skills and smaller than normal sized testes, but did not have enlarged breasts.

Dr. Arnold Lee Medearis, an obstetrician, gynecologist, and geneticist, testified that a male with Klinefelter's syndrome typically has problems with language skills, is infertile, and has an intelligence quotient below the average for others in his family. A male with Klinefelter's syndrome is typically less aggressive than the average person, but may have poor impulse control.

## II. Discussion

### A. Pretrial Issues

Defendant contends the trial court erred by denying his pretrial continuance requests, removing the public defender as his counsel of record, and denying his motion made under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*) to replace the attorney the trial court appointed after it removed the public defender. These are the pertinent facts:

The felony complaint was filed on November 2, 1994. On November 21, 1994, the trial court appointed as defendant's counsel the Riverside County Public Defender, who assigned Deputy Public Defender John Isaacs to handle the case. The information was filed on February 23, 1995. On March 3, 1995, the court set November 20, 1995, as defendant's trial date.

On July 21, 1995, Isaacs advised the trial court that Deputy Public Defender Mara Feiger was also assigned to defendant's case; Feiger was to work exclusively on penalty phase preparation.

On October 13, 1995, on defendant's motion, the trial was continued to January 8, 1996, because defense counsel had not received any DNA evidence from the prosecution and needed more time to complete the penalty phase investigation. On December 15, 1995, the defense still had not received all of the DNA evidence. Because Isaacs was on a leave of absence to care for his ill wife, the trial court set a trial readiness conference for January 26, 1996, and anticipated the trial would start within 30 days from that conference.

On January 26, 1996, the prosecution produced its DNA discovery, and defendant moved to continue the trial to April 15, 1996, to allow him to review the discovery. Stating that the public defender's office had been on the case "well beyond a year,"[1] the trial court instead scheduled a trial readiness conference for February 26, 1996, and anticipated the trial would start within 30 days from that conference. The court also warned Isaacs not to "be surprised the next time you come here and you find me reticent to grant another continuance."

On February 26, 1996, Isaacs informed the trial court that he was not ready for trial because the prosecution had disclosed only its DNA expert's report, but none of the information that would be required to evaluate the report. On March 1, 1996, after the prosecution disclosed the requested information, the court stated, "we are coming up on two years,"[2] scheduled a trial readiness conference for March 22, 1996, and set April 15, 1996, as the trial date.

On March 6, 1996, Isaacs suffered a heart attack and later was hospitalized. On March 19, 1996, Isaacs's doctor signed a note indicating Isaacs would be totally disabled until at least April 19, 1996. On March 22, 1996, defendant orally moved to vacate the trial date because of Isaacs's condition. The trial court denied the motion and continued the trial readiness conference to March 26, 1996.

On March 26, 1996, defendant filed a written motion to continue his trial to an undetermined date. At the hearing on the motion held that day, supervising Deputy Public Defender Toni Healy informed the trial court, "It is unlikely at this point that [Isaacs] will return to trial work." Nonetheless, because there still was "a possibility" that Isaacs could try the case, defendant orally requested a month-long continuance to assess Isaacs's condition. The court noted the age of the case,[3] vacated the trial date, and "put this matter over" to April 2, 1996.

At the April 2 conference, the trial court stated it would relieve the public defender unless that office assigned defendant's case to another attorney. Defendant stated his desire to be represented by the public defender. The court continued the case to April 5, 1996.

On April 5, 1996, Deputy Public Defender Feiger informed the trial court that she was "unprepared" to become lead counsel because she had been

---

[1] The public defender had been appointed 14 months before this hearing.

[2] At this point, Franklin had been killed nearly two years previously, but the public defender had been appointed only 16 months earlier.

[3] The trial court said the case was "old, April of '94," but Healy pointed out the complaint had not been filed until November 1994.

working exclusively on the penalty phase, and it would take her "many months" to familiarize herself with the guilt phase issues. In a written declaration, Supervising Deputy Public Defender Healy explained Isaacs might need bypass surgery. Healy said that if all went well, Isaacs might be able to resume doing jury trials in three months, but it was also possible that he would never be able to return to work again. So that the public defender's office could obtain more information about the state of Isaacs's health, the court scheduled a trial readiness conference on April 12, 1996.

At the April 12, 1996, conference, Acting Riverside County Public Defender Margaret Spencer, Supervising Deputy Public Defender Healy, and Deputy Public Defender Feiger all appeared on defendant's behalf. Spencer told the trial court that defendant's case had been reassigned to Deputy Public Defender Stu Sachs, but he would not be prepared to try the case until January 1997, if he were assigned no other cases by the public defender's office, or April 1997, if he were assigned other cases. The prosecution expressed doubt that Sachs would be able to try the case that soon because of his heavy workload, and moved to have the public defender relieved as defendant's counsel. The court suggested appointing a private attorney as cocounsel to determine whether the requested preparation time was reasonable, and if this private attorney could prepare the case more quickly, the public defender would be relieved. The public defender refused to accept the appointment of cocounsel, so the court found her to be unavailable and relieved her as defendant's counsel.

The trial court appointed private Attorneys Randolph Driggs and Paul Grech to represent defendant, and it ordered them to review the case and advise the court on how long it would take to prepare for trial. The court said it was "not looking for the lowest bidder, . . . not looking for the person who says they can do it in the shortest amount of time"; it said it would reappoint the public defender if Driggs and Grech could not prepare for trial in an amount of time significantly shorter than the estimate given by Sachs. Defendant personally objected to the court's removal of the public defender. The court continued the trial readiness conference to May 3, 1996, with the trial scheduled to start 60 days from that conference.

On April 25, 1996, defendant filed in the Fourth District Court of Appeal a petition for writ of mandate seeking reinstatement of the public defender as his counsel. The petition was summarily denied on April 30, 1996. We denied defendant's petition for review.

On May 3, 1996, Attorneys Driggs and Grech sought to clarify the scope of their representation; the trial court told them they had been counsel of record since April 12. Defendant again objected to the court's April 12

removal of the public defender. The court repeated that it would reappoint the public defender if Driggs and Grech could not prepare for trial in a substantially shorter time than the public defender. The court continued the trial readiness conference to May 13, 1996.

On May 13, 1996, defendant moved to disqualify the trial court under Code of Civil Procedure section 170.6; the trial court summarily denied the motion as untimely. The court said it would let the public defender's office "just step back in the case if they want it," provided that office would be able to try the case in a reasonable amount of time. The court continued the trial readiness conference to May 24, 1996, with the trial scheduled to start by July 2, 1996.

On May 24, 1996, Attorney Grech told the trial court that he and Attorney Driggs would need 10 months to prepare for trial. The court asked if defendant would prefer to be represented by the public defender; defendant responded inaudibly (but presumably in the affirmative). Deputy Public Defender Feiger explained that Deputy Public Defender Sachs had returned from vacation, but the court said it wanted Sachs to appear in court before it would consider reappointing the public defender. The trial readiness conference was continued to May 28, 1996.

On May 28, 1996, Attorney Driggs told the trial court he could be prepared for trial by January or February 1997. The court terminated Grech's appointment to allow Driggs to find his own *Keenan* counsel.[4] (See *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108].) Deputy Public Defender Sachs informed the court that Isaacs was no longer trying cases, and that Sachs had inherited from Isaacs a four-defendant homicide case. The court continued the trial readiness conference to June 3, 1996, to permit the public defender's office to present its estimate as to when it could be ready for trial.

On June 3, 1996, Deputy Public Defender Sachs informed the trial court that, in light of his new case assignments, he could not be prepared to go to trial until June 1997. Defendant moved for substitution of counsel under *Marsden, supra*, 2 Cal.3d 118, citing Attorney Driggs's failure to contact him since his appointment. Defendant also complained of a conflict of interest because the trial judge had been Driggs's "boss" when both were in the Riverside County District Attorney's Office. The court denied the *Marsden* motion and set a status conference for July 12, 1996, with the trial scheduled to start 60 days from that conference.

---

[4] Driggs ultimately indicated he did not think defendant's case warranted the appointment of *Keenan* counsel and represented defendant by himself.

From July 1996 to January 1997, the trial court held periodic status conferences and extended the trial date at each conference. With Driggs representing defendant, the trial began on January 13, 1997.

### 1. *Denial of continuance requests and removal of the public defender as counsel*

Defendant contends the trial court's denial of his requests for continuances and removal of the public defender as counsel of record violated his rights to due process, to equal protection, to the effective assistance of counsel, to representation by counsel of his choice, to present a defense, and to a fair trial under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7 and 15 through 17 of article I of the California Constitution.[5]

### (a) *Denial of continuance request*

At the outset, we note the trial court did not err in denying defendant's section 1050 motion to continue his trial because it in fact granted that motion. On March 26, 1996, defendant moved to continue the trial date to "None set," and the court vacated the trial date. Even after the court relieved the public defender as defense counsel on April 12, it made it clear that defendant's new counsel would be given time to prepare the case. Defendant did not go to trial until January 13, 1997.

Defendant contends, however, that the trial court abused its discretion in denying his March 26, 1996, oral request for a one-month continuance to permit Deputy Public Defender Isaacs's doctor to determine whether Isaacs would be capable of representing defendant. Defendant notes that after the court vacated defendant's trial date on March 26, it continued the case in a piecemeal fashion until April 12, when it relieved the public defender as counsel of record. On April 5, the court knew that if Isaacs required surgery,

---

[5] Our recent observation in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

and if it was successful, Isaacs could resume trying cases by July 1996. On the same date, the court also knew that the public defender's office was still working on the case, despite the court's indication that it was contemplating relieving the public defender as counsel. Defendant thus argues that the court's decision on April 12, 1996, to relieve the public defender rather than ordering another short continuance to learn more about Deputy Public Defender Isaacs's status was, in effect, a denial of defendant's March 26 oral request for a one-month continuance.

Defendant argues that an additional short continuance would not have caused a noticeable delay, as a continuance would have been necessary in any event to analyze the DNA evidence that the prosecution had disclosed only on March 1, 1996. This is especially true, defendant asserts, because on April 12 the trial court gave Attorneys Driggs and Grech three weeks to prepare their estimate on how long it would take them to prepare for trial. Defendant also asserts the trial court's repeated miscalculation of the age of his case caused the court to think the case was older than it actually was (see fns. 1–3, *ante*), and that the court unfairly blamed defendant for the prosecution's tardiness in providing the DNA discovery.

 A continuance in a criminal trial may only be granted for good cause. (§ 1050, subd. (e).) "The trial court's denial of a motion for continuance is reviewed for abuse of discretion." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 84 S.Ct. 841]; see also *Jenkins, supra*, 22 Cal.4th at p. 1039.)

In reviewing the decision to deny a continuance, "[o]ne factor to consider is whether a continuance would be useful. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 1013 [77 Cal.Rptr.2d 25, 959 P.2d 183].) In *Frye*, we upheld the trial court's denial of a midtrial open-ended continuance sought so the defendant could seek medical treatment for his mental health issues, reasoning that the trial court could have reasonably inferred that a continuance "was not likely to result in any positive change in [the] defendant's mental state." (*Ibid.*) In this case, the trial court knew Deputy Public Defender Isaacs had suffered a heart attack that required hospitalization. Supervising Deputy Public Defender Healy told the court it was unlikely Isaacs would return to trial work, although she said he might be able to return to trying cases by July 1996. Although defendant argues that *Frye* is distinguishable because the request there was open ended, here there was no guarantee that on April 19, 1996, Deputy Public Defender Isaacs's physician would have been able to

offer a more accurate prognosis. From the trial court's perspective, there was little to indicate that the issue of Isaacs's fitness to try the case would be resolved in the near future. Therefore, the court did not abuse its discretion by declining to wait for more information.

Even if the trial court did abuse its discretion in denying defendant's request for a continuance to April 19, 1996, he suffered no prejudice. On May 28, Deputy Public Defender Sachs told the court that Deputy Public Defender Isaacs was "no longer trying cases" and that he (Sachs) had taken over another of Isaacs's cases. Defendant argues that this comment meant merely that Isaacs was not trying cases *at that moment*, but there remained the possibility that he could resume doing so in the near future. But if Isaacs could have resumed work on defendant's case (and thus could have been ready for trial before Attorney Driggs) due to improvements in his health, Sachs surely would have mentioned this at either the May 28 or the June 3 hearing, because at each of these hearings Sachs gave the court a status report about when the public defender's office could be available to try the case. Sachs, however, gave no indication that Isaacs would ever be able to try defendant's case. Thus, on April 19 Isaacs was not ready to work on defendant's case, and there was no reason to believe that he could do so in the foreseeable future. Consequently, defendant suffered no prejudice from the court's not waiting until April 19 to learn more about Isaacs's recovery from the heart attack.

Defendant's contention that the trial court should have granted a longer continuance that would have allowed the public defender to remain on the case is related to his claim regarding the trial court's removal of the public defender and is discussed below.

(b) *Removal of appointed defense counsel*

■ "A court may remove appointed counsel both to 'prevent substantial impairment of court proceedings' [citation] and when counsel, without good cause, does not become ready for trial (§ 987.05)." (*People v. Cole* (2004) 33 Cal.4th 1158, 1188 [17 Cal.Rptr.3d 532, 95 P.3d 811] (*Cole*).) A trial court's removal of appointed counsel for an indigent defendant is reviewed for abuse of discretion. (*People v. Panah* (2005) 35 Cal.4th 395, 426 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

Defendant contends his continued representation by the public defender did not threaten to substantially impair judicial proceedings. Defendant argues the trial court removed the public defender for an improper reason: because the public defender refused to accept the appointment of cocounsel. The trial court, defendant reasons, lacked the authority to force a court-appointed

attorney to accept cocounsel. (See *People v. Padilla* (1995) 11 Cal.4th 891, 928 [47 Cal.Rptr.2d 426, 906 P.2d 388]; see also § 987, subd. (d) ["In a capital case, the court may appoint an additional attorney as a cocounsel *upon a written request of the first attorney appointed.*" (italics added)].)

Defendant's contention lacks merit. Although the trial court did state, "[i]f you are telling me you won't cooperate with whoever I appoint, you are going to force me to relieve you," it did so only after it had found the public defender's office's time estimate to be "excessive." The court made clear it would relieve the public defender unless outside counsel agreed that the public defender's time estimate was "reasonable." Thus, the court relieved the public defender because she was delaying the case without good cause, not as punishment for refusing cocounsel. Indeed, the court repeatedly stated it would reappoint the public defender if private counsel could not be prepared in a significantly shorter amount of time. Although Deputy Public Defender Isaacs's medical condition certainly necessitated some delay, the court did not abuse its discretion in concluding that the amount of time the public defender requested was unreasonable. Defendant therefore has not shown that the trial court removed the public defender for an improper purpose.

Citing *Williams v. Superior Court* (1996) 46 Cal.App.4th 320 [53 Cal.Rptr.2d 832], defendant argues the trial court lacked the authority to remove the public defender without further inquiry to determine whether Deputy Public Defender Sachs's estimate of the time he would need to prepare for trial was reasonable. In *Williams*, the trial court appointed private counsel instead of the public defender to represent the defendant because it was concerned that the deputy, Peter Swarth, assigned to represent the defendant was carrying too large a caseload. (*Id.* at pp. 324–325.) Although in *Williams* the defendant's petition for a writ of mandate was rendered moot by the commencement of his trial, the Court of Appeal held that the trial court erred because its decision not to appoint the public defender was based solely on the number and ages of the cases assigned to Swarth without inquiring whether any of those cases might be continued or otherwise expeditiously resolved. (*Id.* at p. 332.) In contrast, here the trial court specifically inquired how long it would take Deputy Public Defender Sachs to prepare defendant's case for trial. The prosecutor expressed concern over Sachs's caseload, and the court also sought outside estimates.[6]

---

[6] Deputy Public Defender Feiger reminded the trial court that the court had "spoke[n] to Mr. Finn like a week or so ago . . . asking Mr. Finn about his attorneys and their, how long it would take them, the consensus is nine months to a year." The court responded, "I also spoke to Mr. Harmon, and I also spoke to Mr. Phillips, and neither of them gave me that kind of estimate." The record does not state who Finn, Harmon, and Phillips were, but apparently they were experienced criminal law practitioners.

To bolster his claim that the trial court did not adequately inquire as to whether Deputy Public Defender Sachs's estimate was reasonable, defendant notes that on January 26, 1996, Deputy Public Defender Isaacs told the court that three more months were needed to analyze the DNA evidence (which was not fully disclosed until March 1), and on April 12 Deputy Public Defender Feiger explicitly said the case was not ready for trial. At the April 12 conference, however, the court asked how long it would take Sachs to prepare, and defendant does not explain why the court could not rely on Sachs's estimate (provided by Deputy Public Defender Feiger) of nine to 12 months. At that conference, the court knew the trial could not start imminently; the issue the court was concerned about was whether the public defender's delay in becoming ready for trial was reasonable. Defendant argues the speed with which other counsel could prepare the case was irrelevant in deciding how long a continuance to grant him. We disagree; the trial court here reasonably concluded that estimates by criminal defense attorneys about the length of time they would need to prepare defendant's case for trial would assist it in evaluating the reasonableness of the public defender's request for a continuance.

Defendant contends the trial court improperly delegated to Attorneys Driggs and Grech its duty to determine the reasonableness of defendant's request for a continuance. The court, however, did not delegate any decision-making authority; rather, it appointed Driggs and Grech as defendant's counsel of record, while leaving open the possibility that it would reappoint the public defender if Driggs and Grech could not be ready for trial much sooner than the public defender's estimate.

Defendant, relying on *Smith v. Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65] (*Smith*), contends that a trial court must exhaust all reasonable alternatives before removing counsel, even (as in this case) incapacitated counsel, and that the trial court here failed to do so before relieving the public defender as defendant's counsel. In *Smith*, after a series of acrimonious exchanges between the trial court and defense counsel, the court, over the defendant's strong objection, vacated counsel's appointment on the ground that he was not competent to represent the defendant. We granted the defendant's petition for writ of mandate and ordered counsel's reinstatement. We noted that trial courts should relieve a defendant's appointed counsel for *physical incapacity* "with great circumspection and only after all reasonable alternatives, such as the granting of a continuance, have been exhausted" (*id.* at p. 559), before going on to explain that the question whether a trial court could remove an attorney for *incompetence*—at issue in *Smith*—was a "far more difficult question" (*ibid.*). We held that the court's removal of the defense attorney in *Smith* based on his arguments to the court

was a "threat to the independence of the bar" (*id.* at p. 560) that constituted "a serious and unwarranted impairment" of the defendant's right to counsel (*id.* at p. 561).

Contrary to defendant's arguments, our decision in *Smith, supra,* 68 Cal.2d 547, did not compel the trial court here to grant a continuance, or to continue the public defender's appointment as counsel of record. At the time the court relieved the public defender as counsel, the public defender had represented defendant for 17 months, the deputy initially assigned to represent defendant (Deputy Public Defender Isaacs) was physically incapacitated and the court had no reason to believe he would ever be able to try the case, the newly assigned deputy (Deputy Public Defender Sachs) said he would need *at least* nine more months before he could try the case, and the trial court had reason to believe (based on the prosecutor's concerns about Sachs's heavy caseload) that even this estimate was unrealistically optimistic. Under these circumstances, the trial court did not abuse its discretion in concluding that all reasonable alternatives to relieving the public defender had been exhausted. (See *Cole, supra,* 33 Cal.4th at p. 1188.)

██ Defendant also relies on three other decisions by this court: *People v. Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868] (*Crovedi*), *People v. Ortiz* (1990) 51 Cal.3d 975 [275 Cal.Rptr. 191, 800 P.2d 547] (*Ortiz*), and *People v. Courts* (1985) 37 Cal.3d 784 [210 Cal.Rptr. 193, 693 P.2d 778] (*Courts*). Each of these cases involved a trial court's decision to remove the defendant's retained counsel of choice, not (as in this case) appointed counsel. To the extent defendant claims a violation of the right to counsel of choice, that right is not applicable here because it applies only to retained counsel. (See generally *People v. Easley* (1988) 46 Cal.3d 712, 732 [250 Cal.Rptr. 855, 759 P.2d 490] ["Failure to appoint the attorney desired by a defendant is not interference with the right to counsel of choice. Conversely, the fact that a defendant is pleased with counsel appointed for him by a court does not transform his attorney into retained counsel . . . [and] the special considerations that must be taken into account when a court contemplates the removal (over objection) of a retained attorney because of a conflict do not come into play . . . ."].) And even if we assume for the sake of argument that the trial court's power to remove appointed counsel is no greater than its power to remove retained counsel (see generally *Smith, supra,* 68 Cal.2d at pp. 561–562), the facts of *Crovedi, Ortiz,* and *Courts* are distinguishable from this case, as we explain below.

In *Crovedi, supra,* 65 Cal.2d at pages 206–209, we held that the trial court erred when it discharged the defendant's attorney, who had suffered a heart attack in the middle of the trial, even though a doctor said the attorney could resume the trial in two months, the same amount of time it would take

successor counsel to prepare for trial. Here, by contrast, Deputy Public Defender Isaacs's heart attack occurred before the trial had started, the projected length of his absence was unknown, and it was unclear that he would *ever* return.

In *Ortiz, supra,* 51 Cal.3d at page 987, we held that the trial court erred in requiring the defendant to demonstrate his retained counsel's incompetence as a condition of discharging counsel. Thus, in *Ortiz* the issue was whether the trial court erred in *refusing* to allow the defendant to discharge his attorney; by contrast, here the issue is whether the trial court erred in *insisting* that defendant's attorney be discharged. And in *Ortiz,* there was no evidence that allowing the defendant to discharge his attorney would disrupt the judicial process, whereas here there was evidence that the public defender was disrupting the judicial process by unreasonably delaying the proceedings: Attorney Drigg's estimate of the time he needed to prepare for trial was less than the public defender's most optimistic estimate, even though the public defender had already represented defendant for almost a year and a half.

In *Courts, supra,* 37 Cal.3d at page 796, we held that the trial court erred in denying the defendant's request for a continuance so retained counsel could be brought into the case. In *Courts,* however, the defendant had been reasonably diligent in trying to replace the attorney appointed by the trial court with privately retained counsel; no privately retained counsel ever sought to represent defendant here.

Defendant also cites a trio of *civil* cases, each holding that a trial court abused its discretion in denying a litigant's motion for a continuance. (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389 [16 Cal.Rptr.3d 638] [reversing directed verdict where litigant was unrepresented because trial counsel unexpectedly had to go to trial in another case]; *Lerma v. County of Orange* (2004) 120 Cal.App.4th 709 [15 Cal.Rptr.3d 609] [reversing summary judgment where trial counsel could not file an opposition due to his hospitalization]; *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242 [9 Cal.Rptr.3d 821] [granting writ of mandate where, after trial counsel's death, the trial court denied successor counsel's requests to reopen discovery and for a continuance].) Even if we assume that these cases, which involve continuance requests by *retained counsel in civil cases,* are pertinent here, where a continuance request was made by *appointed counsel in a criminal case* (but see, e.g., *Roswall v. Municipal Court* (1979) 89 Cal.App.3d 467, 472–473 [152 Cal.Rptr. 337]; compare §§ 987.05, 1050, subd. (e) with Code Civ. Proc., §§ 128, 284), all three are distinguishable: In those cases, the trial court's denial of a continuance meant either that the litigant was unrepresented by counsel, or that the litigant was represented by an attorney who had an inadequate opportunity to prepare. Here, by contrast, the trial court gave the defense an adequate opportunity to prepare for trial.

More pertinent is *Cole, supra,* 33 Cal.4th 1158. In *Cole,* the trial court appointed as defense counsel the Alternate Defense Counsel (hereafter ADC), which assigned the case to Attorney Wayne Brandow. (*Id.* at p. 1179.) After Brandow left the ADC, the trial court granted several continuances because the ADC's replacement for Brandow was not ready for trial, and ultimately the court relieved the ADC as counsel and appointed Attorney Marvin Part, who told the court he could be prepared for trial faster than the ADC. (*Id.* at pp. 1182–1183.) We held the court did not abuse its discretion in relieving the ADC because its skepticism of the ADC's ability to be ready for trial was reasonable in light of that office's requests for a number of continuances. (*Id.* at p. 1188; see also *People v. Panah, supra,* 35 Cal.4th at p. 426 [upholding trial court's replacement of appointed second counsel due to counsel's "indeterminate unavailability"].) As in *Cole,* the trial court here, given the procedural history of defendant's case as discussed above, reasonably was skeptical of the public defender's ability to become ready for trial in a timely manner.

Defendant argues that *Cole* is distinguishable because here Deputy Public Defender Isaacs's heart attack was an unforeseen event and not part of a pattern of delay and unpreparedness for trial, as in *Cole.* Yet Deputy Public Defender Feiger admitted to the trial court that she and Isaacs had been working on a continuance motion before Isaacs's March 6, 1996, heart attack, as they anticipated that they would not be prepared to go to trial on April 15, 1996, the date set by the trial court just before Isaacs's heart attack. Defendant notes that the trial court in *Cole* attempted to accommodate the defendant's preference to be represented by the ADC by granting several continuances, and he faults the trial court here for not doing likewise. But the trial court need not *always* accommodate the defendant's preference. "The essential aim 'is to guarantee "an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 256 [2 Cal.Rptr.3d 554, 73 P.3d 433]; see also *Cole, supra,* 33 Cal.4th at p. 1184.) The trial court need not grant further continuances if it reasonably concludes that it must remove appointed counsel "to 'prevent substantial impairment of court proceedings' [citation] and when counsel, without good cause, does not become ready for trial [citation]." (*Cole, supra,* at p. 1188.) That, in essence, is what the trial court did here.

Defendant further attempts to distinguish *Cole* by noting that there the defendant's appointed counsel, Part, "was 'firm' in [the] defendant's defense" (*Cole, supra,* 33 Cal.4th at p. 1189), whereas here Attorney Driggs did not review defendant's file until after being appointed. But Part's "firmness" in *Cole* was only in comparison to that of former ADC Attorney Brandow (whose availability and readiness were uncertain) and that of the ADC (which the trial court no longer believed could be ready to go to trial in a timely

manner). (*Ibid.*) Here, Driggs reviewed the case file, offered his estimate of the time he needed to prepare for trial, and never wavered from his commitment to the case nor indicated any inability to proceed within his time estimate.

Defendant also contends that the trial court in *Cole, supra,* 33 Cal.4th 1158, removed the ADC with the expectation of expediting those proceedings, but it was unrealistic for the trial court here to think removing the public defender would expedite this case. We disagree. The court considered the public defender's request (after Deputy Public Defender Isaacs's heart attack) for an additional nine to 12 months to prepare for trial (in addition to the 17 months it already had spent on the case). When the court reasonably inquired whom the public defender would assign to represent defendant, the public defender (through her deputies) asked the court to adopt a wait-and-see approach as to when Isaacs would be able to return to work. Under these circumstances, the court did not abuse its discretion in rejecting the public defender's request for the continuance.

Finally, defendant argues that the trial court abused its discretion in denying his April 1996 request for a nine-to-12-month continuance (which would have allowed the public defender to remain on the case) because his trial began in January 1997—that is, within Deputy Public Defender Sachs's original time estimate. But as the prosecutor noted, Sachs already had been assigned another death penalty case, making it unlikely that he would be able to prepare for defendant's trial within a year. And Sachs ultimately revised his time estimate, saying he would not be able to take defendant's case to trial until June 1997. Although defendant's trial began within Deputy Public Defender Sachs's original time estimate, under the circumstances just discussed, the trial court reasonably could have found Sachs's original time estimate to be overly optimistic.

For the reasons given above, the trial court did not abuse its discretion when it removed the public defender as defendant's counsel of record, based on its conclusion that the public defender would not bring defendant's case to trial within a reasonable time.

### (c) *Attorney Driggs's appointment*

■ A trial court is required to appoint counsel for indigent capital defendants. (§ 987, subd. (b); see *People v. Jones* (2004) 33 Cal.4th 234, 244 [14 Cal.Rptr.3d 579, 91 P.3d 939] [an indigent defendant does not have the right to select a court-appointed attorney].) "On appeal, a trial court's orders concerning the appointment of counsel for an indigent defendant are reviewed for abuse of discretion. [Citations.] A court abuses its discretion when it acts

unreasonably under the circumstances of the particular case. [Citation.]" (*Cole, supra*, 33 Cal.4th at pp. 1184–1185.)

Defendant first contends the trial court erred in appointing Attorney Driggs because section 987.2, subdivision (d) requires a trial court to appoint the public defender, unless the public defender is unavailable. Defendant argues the court abused its discretion because the public defender was available. But, as in *Cole, supra*, 33 Cal.4th 1158, the court here reasonably found that the public defender was unavailable because she was unable to be ready for trial in a timely manner. We have never held that section 987.2 trumps either a trial court's discretion to remove appointed counsel when necessary to prevent substantial impairment of the trial proceedings or a trial court's authority under section 987.05 to relieve counsel who, without good cause, does not become ready for trial. We see no reason to do so now.

Defendant contends the trial court's appointment of Attorney Driggs created a conflict of interest because Driggs (along with Attorney Grech) initially was appointed only to give an opinion to the trial court regarding whether the public defender's office's request for the continuance at issue here was reasonable. The limited nature of the appointment, defendant argues, divided Driggs's loyalty between the court and defendant. Without citation of authority, defendant asserts that Driggs was actually working for the court (in a limited capacity) when he was first appointed to defendant's case because the court ordered him to prepare a time estimate within which to bring the case to trial. We disagree. In no way was Driggs and Grech's appointment "limited," the court did not delegate its authority to Driggs and Grech, and by giving a time estimate Driggs did not violate his duty to defendant. The court specifically said, "When I appoint counsel for a defendant, they aren't working for me, they are working for the defendant." The court did not prevent Driggs from zealously advocating for defendant, nor did it create a situation in which Driggs was simultaneously representing the interests of the trial court and defendant.

Defendant further contends the process by which Attorney Driggs was appointed created a conflict of interest. He cites *People v. Barboza* (1981) 29 Cal.3d 375, 379–381 [173 Cal.Rptr. 458, 627 P.2d 188], in which we held that the terms of Madera County's contract with its public defender impermissibly created a financial incentive for the public defender to ignore the existence of an actual or potential conflict of interest in representing its clients. Defendant here asserts that Driggs was placed in a similar situation because Driggs knew he would not be appointed unless he provided a time estimate that was substantially less than that of the public defender's office. Therefore, defendant claims, Driggs had a financial incentive to present a "low bid" to "win" appointment.

But unlike the public defender in *Barboza*, Driggs's attempt here to secure appointment as defendant's counsel did not give Driggs a financial incentive to ignore an existing conflict of interest, nor did it create a conflict of interest. (See *People v. Barboza, supra*, 29 Cal.3d at p. 380 [noting public defender was personally liable for any deficiencies in fund reserved for conflict counsel].) True, Driggs had a financial incentive in securing and maintaining the appointment as a means to create income for himself. But Driggs was not obligated to fulfill his initial time estimate. If, after further research and investigation, Driggs had felt a continuance was necessary to protect defendant's interests, he could have moved for one with no financial consequences, so long as the request was reasonable. Driggs told the court that he would not take the case to trial if he was not fully prepared, and that he would seek a continuance if needed. Notably, after Driggs's appointment, the defense did not request any more continuances, and defendant's case was tried during the timeframe Driggs originally had estimated.

Defendant therefore has not shown that the trial court's appointment of Driggs created a conflict of interest.

### 2. *Denial of* Marsden *motion*

Defendant contends the trial court failed to conduct an adequate inquiry into his complaints regarding Attorney Driggs's representation of him after he moved for substitute counsel under *Marsden, supra*, 2 Cal.3d 118. The court's denial of his motion, defendant argues, also violated his federal due process rights and his expectation that the state would follow its own rules. (See *Powell v. Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 53 S.Ct. 55]; *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].)

Defendant voiced two complaints about Attorney Driggs to the trial court: (1) that neither Driggs nor an investigator had come to discuss the case with him in the seven weeks since the trial court's appointment of Driggs; and (2) that Driggs was working for the trial court, not him. At the June 3, 1996, hearing on the *Marsden* motion, Driggs admitted the lack of communication with defendant, other than when they were in court, since his appointment as counsel (52 days prior to the *Marsden* hearing), and that he and the trial judge previously had been employed in the district attorney's office at the same time.

"In [*Marsden*], we held that a defendant is deprived of his constitutional right to the effective assistance of counsel when a trial court denies his motion to substitute one appointed counsel for another without giving him an opportunity to state the reasons for his request. A defendant must make a

sufficient showing that denial of substitution would substantially impair his constitutional right to the assistance of counsel [citation], whether because of his attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations]. We require such proof because a defendant's right to appointed counsel does not include the right to demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court. [Citation.]" (*Ortiz, supra,* 51 Cal.3d at p. 980, fn. 1.) When reviewing whether the trial court abused its discretion in denying a *Marsden* motion, we consider whether it made an adequate inquiry into the defendant's complaints. (*People v. Smith* (2003) 30 Cal.4th 581, 606 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

On appeal, defendant complains that the trial court never inquired how Attorney Driggs had arrived at his trial preparation time estimate without ever discussing the case with him. Defendant, however, never voiced that complaint, instead faulting Driggs for not communicating with him. The trial court explained to defendant that Driggs had been "devoting his time" to "coming up to speed" on the case materials. Driggs acknowledged at the *Marsden* hearing that he had conferred with defendant only during court appearances up until that point, but he assured the court that once his representation of defendant was "set in earnest," there would "not be a great deal of conflict" about future communication. Driggs explained he had not sent an investigator to meet with defendant because he had not yet hired one due to "an economic factor," but said that he would soon file a motion under section 987.9 for funding for an investigator. At no point after this *Marsden* motion did defendant again complain about a lack of communication by Driggs, even after the trial court told defendant he could file another *Marsden* motion if he still considered Driggs's representation to be inadequate.

Defendant argues that had the trial court made an adequate inquiry, it would have discovered an insurmountable conflict between defendant and Driggs, which was so great that it resulted in a total lack of communication. (See *People v. Smith, supra,* 30 Cal.4th at p. 606.) As evidence, he cites his complaints that "this case [was] about money" and that Driggs was "working for the court," not for him. But defendant said nothing suggesting a total lack of communication caused by a conflict; rather, he expressed concern that Driggs's prior relationship with the court and his preparation of a time estimate at the court's request were indications that Driggs was working for the court, not for him. The court responded appropriately, acknowledging that he had previously worked in a supervisory capacity in the district attorney's office at the same time as Driggs's employment there, and he told defendant he perceived no conflict when Driggs or any other former prosecutorial colleague appeared before him. No further inquiry by the court was necessary.

Thus, "we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel." (*People v. Valdez* (2004) 32 Cal.4th 73, 96 [8 Cal.Rptr.3d 271, 82 P.3d 296].) Consequently, defendant's related constitutional claims also must fail.

B. *Guilt Phase Issues*

1. *Admission of evidence of uncharged conduct during the guilt phase*

At a pretrial conference, the prosecution asked the trial court to admit at trial evidence of defendant's May 1983 robbery of the Tastee Doughnut Shop. According to the prosecutor's offer of proof, the evidence would show that defendant entered through the shop's back door, saying he was looking for a certain "girl." After he was told she was not there, defendant went to the front of the shop, ordered coffee and a doughnut, and played video games. Then, armed with a knife, he jumped over the counter and robbed the cashier, Micaela Partida. When the 67-year-old owner, Carl Shepard, emerged from the back, defendant stabbed him, the blade penetrating Shepard's left eye and emerging from the roof of his mouth. Defendant then stabbed Shepard in the right arm. When police questioned defendant about the robbery, he claimed he had spent the day of the crime in a park and had spent the night with a woman. Defendant later pleaded guilty to attempted murder, mayhem, robbery, and two counts of assault with a deadly weapon, and was sentenced to 18 years in prison.

The evidence of the robbery, the prosecutor argued, was admissible because it tended to show defendant's attempt to commit a burglary in this case. The prosecutor explained that in the Tastee Doughnut Shop robbery, defendant distracted Partida by saying he was looking for a girl and by playing video games, and that there was evidence here that defendant had employed a ruse to get into Franklin's house because there was no sign of forced entry and there was evidence that defendant used the telephone while in her house. The prosecutor also asserted that the stabbing of Shepard was probative of defendant's intent to kill and torture Franklin. Finally, the prosecutor contended that the robbery was admissible to show a common plan or scheme, because in each offense defendant used a ruse to commit the crime, spent a night at a relative's house soon after committing the crime, and denied culpability when questioned by the police.

The trial court ruled the prosecution could introduce evidence of the prior Tastee Doughnut Shop robbery, but it excluded evidence of defendant's prison sentence, and it excluded photographs of Shepard's injuries. The court

allowed defendant's sister Cynthia Mungia to testify, over defendant's objection, that he said he would have to kill the victim if he ever committed "another" robbery. Defendant renewed his objection to all of this evidence at trial.

The evidence introduced during the guilt phase of defendant's trial was somewhat different from the prosecutor's pretrial offer of proof. No witnesses testified during the guilt phase about the facts of the prior robbery. Instead, Officer William Hill testified that he questioned defendant about the robbery and that defendant denied committing the offense, claiming he had spent the day in a park and then had met a woman and had spent the night with her. Hill also spoke with defendant's uncle, who said that defendant actually had spent the night at his home. The prosecution also introduced defendant's redacted guilty plea, in which he admitted that he assaulted Partida and tried to murder Shepard by stabbing him in the arm and ear with a knife.

Defendant contends the trial court erroneously denied his pretrial and midtrial motions to exclude evidence of prior conduct under Evidence Code sections 352 and 1101's subdivision (a). The admission of this evidence, defendant argues, violated his right to due process.

█ With certain exceptions not relevant here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence Code section 1101's subdivision (b) clarifies this general rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

█ In addition to the trial court's power to exclude evidence under section 1101 of the Evidence Code, section 352 of that code allows the trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Rulings made under these sections are reviewed for an abuse of discretion. (*People v. Harrison* (2005) 35 Cal.4th 208, 230 [25 Cal.Rptr.3d 224, 106 P.3d 895].)

Defendant argues that the trial court abused its discretion in admitting evidence of the prior robbery of the Tastee Doughnut Shop as evidence of his intent to kill and rob Franklin and to burglarize her house because these intents were not disputed issues at trial (but see *People v. Carpenter* (1997) 15 Cal.4th 312, 379 [63 Cal.Rptr.2d 1, 935 P.2d 708] [not guilty plea places all elements of the offense at issue]), and that the prior robbery was not sufficiently similar to the burglary, robbery, and murder of Franklin to be probative. He further contends that his use of a false alibi in both the prior Tastee Doughnut Shop robbery and in Franklin's murder did not make the two cases sufficiently similar to allow admission of the prior robbery on the theory that he used a common course or scheme in giving the two alibis. Finally, defendant asserts that the prejudicial effect of the prior robbery, which included evidence that he stabbed Shepard in the eye, was so great that it substantially outweighed any probative value that the prior robbery might have had at the trial for Franklin's murder.

The Attorney General argues that the trial court properly admitted evidence of the prior Tastee Doughnut Shop robbery because even if the crime itself was not similar to Franklin's murder, there were significant similarities in defendant's behavior *before and after* both of these crimes. Before both the prior Tastee Doughnut Shop robbery and Franklin's murder, the Attorney General asserts, defendant used a diversion: At the doughnut store he played video games before the robbery, and Franklin's telephone records at the time of murder suggest he gained entry to her house by asking to use her telephone.[7] The Attorney General also points out that in both cases defendant stayed with a relative after the crime, and that he used somewhat similar alibis for both crimes: He claimed to have been in a park on the day of the prior Tastee Doughnut Shop robbery, and he claimed to have been at home during Franklin's murder and then in a park the next day.

We need not decide whether the trial court erred in admitting evidence of the prior Tastee Doughnut Shop robbery because any error was harmless. In this case, defendant was seen speaking to Franklin shortly before the murder, and he was seen driving Franklin's car away from the scene of the crime. After Franklin's murder, defendant's fingerprints were found on her car, which was abandoned near the home of his relatives in Santa Ana. Around the time of her murder, a telephone call was made from Franklin's telephone to these same relatives in Santa Ana. Shortly after Franklin's murder, the police observed scratches on defendant's body, and genetic tissue under Franklin's fingernails that was recovered after her murder was consistent with defendant's DNA. When the police questioned defendant about Franklin's

---

[7] Although the prosecution mentioned in its offer of proof that defendant played video games in the Tastee Doughnut Shop as a diversion, it did not present evidence of that diversion at the guilt phase of trial.

murder, he falsely told them he was in his trailer that night, that he had never been in Franklin's house and never touched her car, and that he did not know anyone in Santa Ana.

In short, the evidence of defendant's guilt was overwhelming. As a result, any error in admitting evidence of the prior Tastee Doughnut Shop robbery during the guilt phase did not prejudice defendant.

### 2. *Instruction on uncharged conduct (CALJIC No. 2.50)*

When orally instructing the jury with the 1994 revision of CALJIC No. 2.50, the trial court omitted a portion of the standard instruction, italicized below: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme *in the commission of criminal acts similar to the method, plan or scheme* used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged. [¶] The existence of the intent which is a necessary element of the crime charged. [¶] For the limited purpose for which you may consider such evidence you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose." The written instructions did contain a complete version of CALJIC No. 2.50.

Defendant contends the incomplete instruction allowed the jury to consider the uncharged conduct (the prior Tastee Doughnut Shop robbery) as evidence of his intent during the charged conduct in this case (Franklin's robbery, burglary, and murder) without first determining whether the charged and uncharged conduct were similar, and thus to infer improperly from the prior robbery that he was predisposed to criminally violent behavior. Defendant claims the instruction violated his rights under state law and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7 and 15 through 17 of article I of the California Constitution.

Defendant does not argue that the written instructions were incorrect, and he acknowledges we often have held that when erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions, particularly when, as here, the jury is instructed that the written version is controlling. (See, e.g., *People v. Osband* (1996) 13

Cal.4th 622, 687–688 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Defendant insists that these cases were wrongly decided. He does not persuade us that we should reconsider the matter.

Defendant asserts there was no evidence that the jury actually received the written instructions. We disagree. Although the record does not explicitly state that the jury received the written instructions, it does show that the trial court twice orally instructed the jury it would receive written instructions. (See CALJIC No. 17.45.) If the jury had not received the written instructions, we presume it would have told the court so. We therefore conclude that the jury was given the written instructions.

Even if the jury never received a written version of CALJIC No. 2.50, the trial court's omission of the phrase "in the commission of criminal acts similar to the method, plan or scheme" during the oral instructions was harmless under any standard. Just before Officer William Hill testified about the prior robbery at the Tastee Doughnut Shop, the trial court gave a limiting instruction to the jury about uncharged acts. The instruction mirrored the language of CALJIC No. 2.50 and included the phase "in the commission of criminal acts similar to the method, plan or scheme," which the court omitted from the oral closing instructions. Moreover, Attorney Driggs specifically argued there was no plan or scheme common to both the charged and uncharged conduct, while the prosecutor highlighted the similarities of both. In addition, the court repeatedly told the jury not to use the uncharged conduct as propensity evidence, giving this instruction during voir dire, just before Officer Hill's testimony, and as part of the oral closing instructions. Both the prosecutor and defense counsel during closing arguments stressed that the prior robbery could only be used as evidence of defendant's intent during the burglary, robbery, and murder of Franklin, or as evidence of a common plan or scheme. In light of the totality of the court's instructions and counsel's explicit arguments regarding the similarity, or lack thereof, of the charged and uncharged conduct, it may reasonably be inferred that the jury understood it was first required to find that the charged and uncharged offenses were similar before it could consider the relevance, if any, of the uncharged conduct.

Finally, the court's omission of a portion of CALJIC No. 2.50 did not prejudice defendant because the instruction applied only to evidence of the prior robbery at the Tastee Doughnut Shop, and we have held already there was no prejudice in admitting evidence of the prior robbery. For the same reasons, defendant suffered no prejudice from the trial court's omission of a portion of CALJIC No. 2.50 during the oral closing instructions.

### 3. *Instruction on admissions (CALJIC No. 2.71)*

Both parties initially asked the trial court to instruct the jury with CALJIC No. 2.71, which warns the jury to view a defendant's admissions with caution. But after some discussion, both parties withdrew their requests for the instruction. Nonetheless, defendant argues that, by not instructing the jury with CALJIC No. 2.71, the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7 and 15 through 17 of article I of the California Constitution.

██ CALJIC No. 2.71 reads: "An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] [Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]" "When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution. [Citation.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

Defendant asserts that his statements to Detective Gary DeVinna that the scratches on his chest were itch scratches, that he was in his trailer the night Franklin was killed and spent the next day performing various tasks, that he did not know anyone in Santa Ana and had not been there in the months before Franklin's death, that on previous visits to Santa Ana he normally caught a bus near where Franklin's car was found, and that he never entered Franklin's house or touched her car were admissions that warranted a jury instruction. The Attorney General concedes the trial court erred in failing to instruct the jury with CALJIC No. 2.71. We agree.

Defendant contends that the trial court's instructional error violated his federal constitutional rights, and that reversal is required unless the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) The Attorney General argues, however, that the error requires reversal only if it is reasonably probable that the error had an effect on the verdict. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We need not decide which standard to apply because the error was not prejudicial under either standard. The purpose of CALJIC No. 2.71 is to help the jury determine whether the statements (in this case, defendant's statements to Detective DeVinna) were

ever made. (*People v. Livaditis* (1992) 2 Cal.4th 759, 784 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Defendant did not cross-examine DeVinna about his statements, nor is there any evidence that would cast doubt on the detective's testimony about the statements. There is simply no dispute as to whether defendant made these statements, or whether DeVinna accurately recalled them.

Defendant also argues that his signed statement on the redacted guilty plea form admitting that he committed the prior Tastee Doughnut Shop robbery was an admission, which permitted the jury to infer that because his alibi in that case was false, his alibi in this case also must be false. Defendant does not cite any authority for the proposition that juries must be instructed to view with caution admissions made as part of a plea bargain stemming from uncharged conduct. Even if we assume such an instruction is necessary, there was, for the reasons stated above, no prejudice because defendant never disputed that he signed the statement.

### 4. *Instruction on willfully false statements (CALJIC No. 2.03)*

Defendant contends the trial court erred in instructing the jury that it could consider, as evidence of his guilt, any willfully false statements that he had made. CALJIC No. 2.03, as read by the trial court, states: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

Here, the prosecution introduced evidence that defendant made willfully false statements to Detective Gary DeVinna that he spent the night of April 12, 1994, in his trailer and that he spent the following day looking for a job and at the park. Defendant argues that when the trial court gave CALJIC No. 2.03, it inaccurately instructed on the inferences the jury could properly draw from these statements, thereby violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7 and 15 through 17 of article I of the California Constitution.

According to defendant, CALJIC No. 2.03 creates a permissive presumption, and instructions creating such presumptions are constitutional only if there is a rational connection between the facts found by the jury and those implied by the instruction. (See *Ulster County Court v. Allen* (1979) 442 U.S. 140, 156–157 [60 L.Ed.2d 777, 99 S.Ct. 2213].) Here, defendant claims, the instruction allowed the jury to infer from his false statements that he killed

Franklin with premeditation, or that he killed her in the course of a burglary or robbery. These inferences, he asserts, are irrational. We consistently have rejected similar claims. (See, e.g., *People v. Geier* (2007) 41 Cal.4th 555, 589 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Griffin* (1988) 46 Cal.3d 1011, 1027 [251 Cal.Rptr. 643, 761 P.2d 103]; *People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].)

> 5. *Sufficiency of the evidence for the torture-murder special-circumstance finding*

 Defendant contends the evidence presented at trial was insufficient to support the jury's torture-murder special-circumstance finding. We agree.

 First degree murder is punishable by death if the murder "was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) The torture-murder special circumstance requires proof that a defendant intentionally performed acts that were calculated to cause extreme physical pain to the victim. (*Cole, supra*, 33 Cal.4th at p. 1228.) Required is "an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*People v. Elliot* (2005) 37 Cal.4th 453, 479 [35 Cal.Rptr.3d 759, 122 P.3d 968], fn. omitted (*Elliot*).) We review the entire record, in the light most favorable to the prosecution, to determine whether a rational trier of fact could have found the essential elements of the torture-murder special-circumstance allegation beyond a reasonable doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Osband, supra*, 13 Cal.4th at p. 690 [test for sufficiency of a special circumstance finding is the same as that for a criminal conviction].)

Here, there is ample evidence that when defendant battered Franklin to death with a blunt object, he caused her to experience great pain and suffering: The pathologist, Dr. Garber, testified that Franklin's injuries were "extremely painful." Defendant argues, however, that there is no evidence that he acted with an *intent* to torture; that is, "for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*Elliot, supra*, 37 Cal.4th at p. 479.) The Attorney General does not contend that defendant was motivated by revenge, extortion, or persuasion, but he asserts that the jury reasonably could have found that defendant committed the murder "with a 'sadistic intent to cause the victim to suffer pain in addition to the pain of death.' [Citation.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 841 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*).) We are not persuaded.

The intent to torture "is a state of mind which, unless established by *the defendant's own statements* (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the *circumstances surrounding the commission of the offense* [citations], which include *the nature and severity of the victim's wounds.*" (*People v. Crittenden* (1994) 9 Cal.4th 83, 141 [36 Cal.Rptr.2d 474, 885 P.2d 887], italics added (*Crittenden*).) "We have, however, cautioned against giving undue weight to the severity of the wounds" (*People v. Chatman* (2006) 38 Cal.4th 344, 390 [42 Cal.Rptr.3d 621, 133 P.3d 534] (*Chatman*)); severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence.

Here, the prosecution introduced statements by defendant that were probative of his intent when he murdered Franklin: Defendant's sister, Cynthia, testified that before the murder, defendant had told her "on a constant basis" that if he ever committed another robbery, he would have to kill the victim to avoid being identified. This is strong evidence that defendant entered Franklin's house intending to kill her, but it is not evidence from which a rational trier of fact could infer that he beat Franklin to death for a sadistic purpose. Rather, defendant's statements to his sister suggest that he killed Franklin to ensure that she would not survive to identify him as the person who had robbed her.

Nor do the circumstances of the offense or the nature of the wounds provide evidence from which a rational trier of fact could infer an intent to torture. Defendant killed Franklin by hitting her repeatedly in the head with a blunt object. Franklin also sustained defensive wounds to her hands, as well as minor wounds to her arms and shoulders. The killing was brutal and savage, but there is nothing in the nature of the injuries to suggest that defendant inflicted any of them in an attempt to torture Franklin rather than to kill her.

The Attorney General is unable to point to any other case in which we have upheld a jury's torture-murder special-circumstance finding based on facts comparable to the evidence presented here. When we have upheld such findings, the evidence has shown that the defendant deliberately inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 [79 Cal.Rptr.3d 125, 186 P.3d 496] [defendant "methodically poured" hot oil on multiple portions of the victim's body]; *Chatman, supra,* 38 Cal.4th at p. 390 [the defendant inflicted over 50 stab wounds all over the victim's body, and later told a friend he persisted in stabbing the victim because it "felt good"]; *Elliot, supra,* 37 Cal.4th at p. 467 [the defendant inflicted 81 stab wounds, only three of which were potentially fatal, and meticulously split the victim's eyelids with

a knife]; *Cole, supra,* 33 Cal.4th at pp. 1212–1214, 1229–1230 [defendant made statements indicating he was angry at the victim, poured gasoline over her body, and set it alight]; *Bemore, supra,* 22 Cal.4th at p. 842 [defendant inflicted eight unusual nonfatal wounds in the victim's flank before stabbing him to death and made statements implying that he inflicted those wounds in an effort to persuade the victim to open a safe]; *Crittenden, supra,* 9 Cal.4th at p. 141 [the defendant broke one victim's jaw before killing him and inflicted "fairly superficial cuts that clearly were not intended to be lethal" in an attempt to persuade another victim to write a check payable to the defendant]; *People v. Proctor* (1992) 4 Cal.4th 499, 531 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [the defendant severely beat the victim and inflicted a series of nonfatal "incision-type stab wounds to her neck, chest, and breast area" before strangling her]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1240 [278 Cal.Rptr. 640, 805 P.2d 899] [the defendant made incisions with "a nearly scientific air" that demonstrated a calculated intent to inflict pain]; see also *People v. Cook* (2006) 39 Cal.4th 566, 602–603 [47 Cal.Rptr.3d 22, 139 P.3d 492] [evidence sufficient to show first degree torture-murder where the defendant kicked and beat the victim with a stick for a long period while he lay unresisting in the street]; *People v. Raley* (1992) 2 Cal.4th 870, 889 [8 Cal.Rptr.2d 678, 830 P.2d 712] [evidence sufficient to show first degree torture-murder where the defendant inflicted 41 knife wounds on the victim while she screamed, wrapped her in rugs and left her (still conscious) in the trunk of his car for hours before throwing her down a ravine; he inflicted similar injuries on the victim's friend, who miraculously survived].)

Here, unlike the cases described above, there is no evidence that defendant deliberately inflicted nonfatal wounds to the victim in an attempt to increase her suffering. Nor is there evidence that defendant was angry at the victim or that he had any motive to inflict " 'pain in addition to the pain of death.' " (*Bemore, supra,* 22 Cal.4th at p. 841.)

As evidence of defendant's sadistic intent, the Attorney General points out that defendant tightly bound Franklin's hands and feet. We agree with the Attorney General that "[b]inding may take place in some instances of torture . . ." (*Chatman, supra,* 38 Cal.4th at p. 391), and in several cases we have noted that the defendant bound the victim when summarizing the evidence supporting a jury's torture-murder special-circumstance finding (*Bemore, supra,* 22 Cal.4th at p. 842; *Crittenden, supra,* 9 Cal.4th at p. 141; *People v. Proctor, supra,* 4 Cal.4th at p. 530), but in each of those cases the evidence of binding was accompanied by other strong evidence of the defendant's sadistic intent. We have never found that evidence that the defendant bound the victim is, by itself, substantial evidence of an intent to inflict sadistic pain. Here, defendant bound the victim in the course of robbing her; it is not uncommon for robbers to bind their victims to prevent them from resisting or escaping.

In short, the record does not contain "substantial evidence—that is, evidence that is reasonable, credible, and of solid value" (*Cole, supra,* 33 Cal.4th at p. 1212) from which the jury could find that defendant intended to torture Franklin. We therefore vacate the torture-murder special-circumstance finding.

Defendant claims that our reversal of the torture-murder special circumstance requires reversal of the judgment of death. We find the error harmless under any standard. The jury properly considered two other valid special circumstance findings (murder in the commission of a burglary and robbery), all of the facts and circumstances underlying Franklin's murder, and defendant's lengthy criminal record. There is no likelihood that the jury's consideration of the mere existence of the torture-murder special circumstance tipped the balance toward death. We have frequently rejected similar contentions. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 520–523 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Morgan* (2007) 42 Cal.4th 593, 628 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [64 Cal.Rptr.3d 721, 165 P.3d 512]; see also *Brown v. Sanders* (2006) 546 U.S. 212, 221–225 [163 L.Ed.2d 723, 126 S.Ct. 884].)

### C. *Penalty and Posttrial Issues*

#### 1. *Automatic application to modify the verdict*

Defendant contends the trial court erred under state law when, in denying his automatic application for modification of the death verdict, it failed to state any reasons for denying the application. He contends the error also violated the due process guarantees of the Eighth and Fourteenth Amendments to the United States Constitution.

Under section 190.4, subdivision (e), in every case in which there is a death verdict, the defendant is deemed to have made an application for modification of the verdict. In ruling on the application, the trial court reweighs the evidence, considers the aggravating and mitigating circumstances, and determines whether, in its independent judgment, the weight of the evidence supports the jury's verdict. (See *People v. Burgener* (2003) 29 Cal.4th 833, 891 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113].) The court must state on the record the reasons for its findings. (§ 190.4, subd. (e).) The ruling on an automatic application to modify the death verdict must be "sufficiently articulated to assure meaningful appellate review." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1064 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*).)

The entirety of defendant's application and the trial court's denial was as follows:

"THE COURT: Is there going to be a formal motion to modify the judgment or make it orally?

"MR. DRIGGS: Yes—well, orally.

"THE COURT: Okay. You want to do so, go right ahead.

"MR. DRIGGS: Yes, Your Honor. [¶] On behalf of [defendant], we make an oral motion to the Court to modify the sentence that the jury returned of death to the sentence of life without parole. [¶] The argument of that is merely that the evidence as to, shall we say, lingering doubt and Klinefelter's is such that the appropriate punishment should be life without parole. Submit.

"THE COURT: People.

"[PROSECUTOR]: I submit on my Points and Authorities, unless the Court wishes to hear further.

"THE COURT: I don't. And I am denying the motion to modify the judgment."

By not stating its reasons for denying the modification motion, the trial court did not comply with section 190.4, subdivision (e), and the Attorney General does not dispute the error. He contends, however, that defendant has forfeited this issue because of his failure to object in the trial court. We agree. If a defendant fails to make a specific objection to the court's ruling at the modification hearing, the claim is forfeited. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969].) This rule applies only to cases in which the modification hearing was conducted after the finality of this court's decision in *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984]. (*Riel, supra,* 22 Cal.4th at p. 1220.) As defendant's modification hearing was held post-*Hill,* the forfeiture rule applies here.

Defendant insists that the forfeiture rule is inapplicable here because we have previously applied it only in cases in which the trial court stated reasons for denying the modification motion—thereby creating a record adequate to review its ruling—but the defendant failed to object to the trial court's consideration of inadmissible or irrelevant evidence. (See, e.g., *People v. Tafoya* (2007) 42 Cal.4th 147, 196 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1183 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1064; *People v. Martinez* (2003) 31 Cal.4th 673, 701 [3 Cal.Rptr.3d 648, 74 P.3d 748].) Those cases, defendant argues, are distinguishable because "this Court had before it a record that made clear the trial

judge's understanding of his duties . . . ." Here, he contends, "the record does not show the judge's understanding of his duty and authority . . . ."

For forfeiture purposes, we see no significant difference between a court that states reasons for denying the modification motion and one that does not (as in this case): In either event, the defendant must bring any deficiency in the ruling to the trial court's attention by a contemporaneous objection, to give the court an opportunity to correct the error.

Pertinent here is *People v. Horning* (2004) 34 Cal.4th 871 [22 Cal.Rptr.3d 305, 102 P.3d 228] (*Horning*). There, after a penalty phase bench trial, the trial court rendered a death verdict and gave its reasons for doing so. The court also explained its reasoning when it denied the defendant's motion for a new trial. (*Id.* at p. 911.) The question then arose whether the defendant was entitled to a modification hearing. The defendant agreed it was not necessary for the court to repeat its prior reasons, so the court imposed a death sentence. (*Id.* at p. 912.) On appeal, the defendant claimed the court erred by never ruling on his automatic application to modify his sentence. We held that "[b]ecause defendant did not object [in the trial court], and the hearing occurred after our decision in *People v. Hill*[, *supra*,] 3 Cal.4th 959 . . . , the issue is not cognizable on appeal. [Citation.]" (*Ibid.*)

Defendant argues *Horning, supra*, 34 Cal.4th 871, is distinguishable because, unlike this case, the trial court there understood its obligation to state reasons for denying the defendant's application for modification of the death verdict. But a court's understanding of its obligation to comply with section 190.4, subdivision (e) is not relevant to whether the defendant has forfeited the issue by failing to object. Thus, just as the defendant in *Horning* forfeited his claim that the trial court failed to rule upon the automatic application, defendant here forfeited his claim that the trial court failed to state its reasons for denying the application.

### 2. *Constitutionality of the death penalty*

Defendant contends his death sentence violated various guarantees under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7 and 15 through 17 of article I of the California Constitution. As we have in other cases, we reject defendant's contentions. Specifically:

Section 190.3, factor (a) does not violate the Eighth Amendment. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Factor (a) is not overbroad, nor does it allow for arbitrary and capricious imposition of the death penalty. (See, e.g., *People v. Williams* (2008) 43 Cal.4th 584, 648 [75 Cal.Rptr.3d 691, 181 P.3d 1035].)

The prosecution is not constitutionally required to prove (either beyond a reasonable doubt or by a preponderance of the evidence) either the existence or greater weight of aggravating circumstances. (See, e.g., *People v. Thornton* (2007) 41 Cal.4th 391, 468 [61 Cal.Rptr.3d 461, 161 P.3d 3].) Contrary to defendant's contention, neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) nor *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*) affected these conclusions. (See, e.g., *People v. Barnwell* (2007) 41 Cal.4th 1038, 1059 [63 Cal.Rptr.3d 82, 162 P.3d 596]; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1068.)

The trial court need not instruct on a presumption of life during the penalty phase. (See, e.g., *People v. Zamudio* (2008) 43 Cal.4th 327, 373 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

The federal Constitution does not require the jury to agree unanimously on which aggravating circumstances exist. (See, e.g., *People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351].) Contrary to defendant's contention, neither *Apprendi, supra,* 530 U.S. 466, *Blakely, supra,* 542 U.S. 296, nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], has affected this conclusion. (See, e.g., *People v. Hoyos* (2007) 41 Cal.4th 872, 926 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1068.)

The federal Constitution does not require written jury findings during the penalty phase, and the lack of such findings does not deprive a capital defendant of meaningful appellate review. (See, e.g., *People v. Tafoya, supra,* 42 Cal.4th at p. 197.)

Intercase proportionality review is not constitutionally required. (See, e.g., *People v. Richardson* (2008) 43 Cal.4th 959, 1034 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)

Equal protection does not require that capital defendants be afforded the same sentence review afforded other felons sentenced under the determinate sentencing law. (See, e.g., *People v. Watson* (2008) 43 Cal.4th 652, 703–704 [76 Cal.Rptr.3d 208, 182 P.3d 543].)

3. *Application of international law to the death penalty*

Defendant contends California's death penalty scheme violates the Eighth and Fourteenth Amendments to the United States Constitution by violating international law and norms of humanity and decency.

Article VI, section 1, of the International Covenant on Civil and Political Rights (hereafter ICCPR) prohibits the arbitrary deprivation of life, while article VII prohibits "cruel, inhuman or degrading treatment or punishment." The United States is a signatory to the ICCPR. (*People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

The parties disagree on whether defendant has standing to challenge the death penalty under the ICCPR. (Compare *U.S. v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1286 [individuals have standing] with *Beazley v. Johnson* (5th Cir. 2001) 242 F.3d 248, 267–268 [individuals lack standing].) As we have done in the past, we assume without deciding that defendant has standing (see, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1299 [57 Cal.Rptr.3d 543, 156 P.3d 1015]; *People v. Ramirez* (2006) 39 Cal.4th 398, 479 [46 Cal.Rptr.3d 677, 139 P.3d 64]; *People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622]), but we deny his claim on the merits. "The [ICCPR] . . . specifically permits the use of the death penalty if 'imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime.' [Citations.] And when the United States ratified the treaty, it specially reserved the right to impose the death penalty on any person, except a pregnant woman, duly convicted under laws permitting the imposition of capital punishment. [Citations.]" (*People v. Perry* (2006) 38 Cal.4th 302, 322 [42 Cal.Rptr.3d 30, 132 P.3d 235].) Because the trial court here imposed defendant's sentence in accordance with the applicable law, his capital sentence does not violate the ICCPR.

California's status as being in the minority of jurisdictions worldwide that impose capital punishment, especially in contrast with the nations of Western Europe, does not violate the Eighth Amendment. (See, e.g., *People v. Moon* (2005) 37 Cal.4th 1, 47–48 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

We therefore conclude California's death penalty scheme does not violate international law or norms of humanity and decency.

### 4. Cumulative error

Defendant contends that the cumulative effect of the guilt and penalty phase errors requires reversal of his conviction and death verdict even if no single error compels reversal. Whether considered separately or together, any errors or assumed errors had no effect on the judgment.

### III. CONCLUSION

The torture-murder special-circumstance finding is vacated. The remainder of the judgment, including the sentence of death, is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 24, 2008. Corrigan, J., did not participate therein.