Filed 8/21/25  P. v. Graham CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSALYN KENDY GRAHAM,<br><br>    Defendant and Appellant. | B300167<br><br>(Los Angeles County Super. Ct. No. BA464605)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

It is ordered that the opinion filed herein on August 6, 2025, be modified as follows:

1. On page two, at the end of the last full sentence, ending with "sentencing enhancements," add the following as

footnote 2 and renumber subsequent footnotes accordingly:

> Because the remand order from the Supreme Court was limited to this issue, we requested supplemental briefing limited to that same issue. (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701 ["The order of the reviewing court . . . defines the scope of the jurisdiction of the court to which the matter is returned"].) The petition for rehearing filed in this case, which largely chides this Court for not revisiting issues outside the scope of remand, either disregards or misunderstands this fundamental restriction on our jurisdiction; we will not—and, indeed, cannot—revisit the issues outside the scope of the remand.

2. On page 24, in the first paragraph, after the phrase "(that the crime involved premeditation)," add the following as footnote 5 and renumber subsequent footnotes accordingly:

> In her petition for rehearing, defendant argues that the trial court is barred from considering the aggravating factor based on "planning" and "sophistication" as an aggravating factor because this factor mirrors the "premeditation" element of the attempted murder count and because section 1170, subdivision (b)(5) provides that "[a] court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under

any provision of law." This argument is waived, because defendant did not make this argument in her supplemental brief. (E.g., *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1013.) The argument also lacks merit, because section 1170, subdivision (b)(5) applies limits to the imposition of the upper term *for a crime*; upper terms *for enhancements* are governed by section 1170.1, which contains no limitation parallel to section 1170, subdivision (b)(5).

3. On page 24, in the second full sentence of the first paragraph, add "as well as *People v. Wiley* (2025) 17 Cal.5th 1069, 1082-1084," after "Under *Lynch*," and, in the second clause of the sentence, add "under *Lynch*," between "and" and "can be found harmless only if," so that the full sentence reads:

   Under *Lynch*, as well as *People v. Wiley* (2025) 17 Cal.5th 1069, 1082-1084, this constitutes both a statutory and constitutional violation, and under *Lynch*, can be found harmless only if we conclude (1) that a jury would have found the cruel and callous factor to be true beyond a reasonable doubt and (2) the record clearly indicates that the trial court would have imposed a high term for the sentencing enhancement had it been aware of the presumption against doing so imposed by the new section 1170.1.

4. On page 26, at the end of the sentence in the first paragraph beginning, "The court also noted," add the following as footnote 6:

> In her petition for rehearing, defendant argues that we have "omitted material facts" by not recounting her personal accomplishments prior to committing the charged crimes (e.g., serving as a "grounded Girl Scout leader," a "student Government Association" "president" at her college, a singer of the National Anthem at her college commencement in 2009, her ability to play three musical instruments, and her career accomplishments), but none of these qualifies as a mitigating circumstance under California Rules of Court, rule 4.423(b)—and, more to the point, the trial court was aware of these facts (whether or not we recite them in our opinion on review) and yet *still* made the findings it made.

*     *     *

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.             HOFFSTADT, J.*          CHAVEZ, J.

_____

* Presiding Justice of Division Five of the Court of Appeal, Second
Appellate District, assigned by the Chief Justice pursuant to
article VI, section 6 of the California Constitution.

Filed 8/6/25  P. v. Graham CA2/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B300167 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA464605) |
| JESSALYN KENDY GRAHAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura C. Ellison, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Stacy Schwartz and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

*   *   *

After a woman's on-again, off-again boyfriend broke off their relationship for good, she stabbed him in the back and the heart.  Literally.  He survived the attack, and a jury convicted her of attempted premeditated murder with enhancements for personal use of a deadly weapon and personal infliction of great bodily injury.  On appeal, she argues that the trial court got the jury instructions wrong, erred in not granting a midtrial continuance, erred in not referring her for a second competency hearing, erred in not considering her for a pretrial diversion program she never requested, and erred in not considering pretrial diversion under Penal Code section 1001.36[1] even though she did not request such diversion until appeal.  We rejected these arguments in an opinion filed on May 27, 2021.  Our Supreme Court granted review and, on May 28, 2025, remanded the matter back to us "with directions to vacate [our prior] decision and" to consider a new issue raised for the first time before the Supreme Court—namely, whether the trial court erred in imposing a high-term sentence of five years on one of the sentencing enhancements.  Although the trial court erred in

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

imposing the high term without a jury finding or admission by defendant, that error was nevertheless harmless.

## FACTS AND PROCEDURAL BACKGROUND

### I.   Facts

#### A.   *The relationship*

From 2003 through 2013, Jessalyn Kendy Graham (defendant) and Luke Hardman (Hardman) were in an on-again, off-again dating relationship.  When Hardman broke it off in 2013, they remained cordial:  Defendant moved from the house she shared with him to the studio unit behind the house, and they continued to have sex on a monthly basis.

In early April 2017, Hardman told defendant he had started dating someone else.  Defendant did not take the news well.  In mid-April 2017, defendant and Hardman got into a verbal argument that ended when defendant grabbed Hardman's phone, locked herself in his car, and proceeded to send text messages from Hardman's phone to the woman he was now dating; in those messages, defendant—while posing as Hardman—told his girlfriend that he "missed" defendant and that he and the new girlfriend needed to break up because he could not "do this anymore," and signed off with "I'm sorry. Goodbye."

Upset at her intrusive conduct, Hardman told defendant she had to "pack her things and move out" of the studio.  He also disinvited her from his upcoming graduation ceremony for his master's degree.

3

**B. *The incident***

    1. *The setup*

On May 6, 2017, defendant had yet to move out of the studio unit and asked Hardman to come by that night to care for her two cats because she said she was feeling suicidal.

When Hardman went to defendant's studio unit to bring the cats to the main house, defendant asked him to come back 30 minutes later. Toward the end of that period, she called the nonemergency line for the local police. She told the answering officer that she was "looking to file a domestic violence report" because her ex-boyfriend had become "crazy" and "unstable" after she broke up with him, and had on a previous occasion "held [her] hostage," "choked" her, and "injured" her. She reported being "scared" because she had "no idea what he's capable of."

As Hardman returned per defendant's request, she told the police that he was "right outside [her] door" and hung up.

    2. *The attack*

Because defendant had asked Hardman to return and left her front door unlocked, Hardman entered to retrieve the cats. After he did, defendant locked all three locks on the front door. She then started in on him about how it "wasn't fair" that he had asked her not to attend his graduation.

Uninterested in retreading the issue, Hardman decided to leave. Defendant prevented him. She blocked his exit by blocking her front door. He "gently" pushed her aside, but she "jumped" back into his path. He pushed her aside a second time, and she "jumped" back into his path a second time. Then Hardman shoved her "a lot harder," causing her to stumble backward but not fall, and he "bolt[ed]" for the door.

4

Before he could unlock the locks and leave, defendant stabbed him in the back with an Ikea kitchen knife. They got into a "scuffle," where she proceeded to stab him through the heart and slice him open along his rib cage.

Defendant then proceeded to toy with Hardman as he was bleeding profusely. When he reached for his phone to call 911, defendant took his phone from him to prevent him from calling because, she told him, he was not hurt "that badly" and his call would "get [her] in trouble." Hardman then implored *her* to call 911, and she mocked him by pretending to call 911 without actually doing it. As Hardman slumped to the floor from weakness, defendant put her face in his and asked, "Oh, do you still love me? Are you still in love with me?" When Hardman replied, "Yes, I love you," defendant instructed him to "give [her] one last kiss" to "show [her] [he] love[s her]." Hardman obliged by kissing her on the lips. Defendant then feigned a 911 call a second time.

Hardman told defendant he could feel that his bowels were about to release, and asked her to help him to the bathroom. With her help, Hardman stumbled to the bathroom, but only sat on the toilet for a moment before collapsing onto the floor. When Hardman then begged her to "please call 911," she finally did so.

3.    *Defendant's postattack reports of violence*

On the two back-to-back 911 calls she made and in a voluntary interview with the responding officers, defendant offered conflicting accounts of what had happened. On the 911 calls, she reported that a man who was both her "ex" and her "fiancé" "came at her" and she had to "stab him" to protect herself because she was afraid he would "hurt [her] again" like he did in mid-April when he "held [her] hostage." In the subsequent

5

interview, she reported that Hardman had shown up that night wielding a green-handled knife and proceeded to strangle her. However, police found no green-handled knife at the scene, and defendant had no injuries except a small laceration on her right bicep that was not a recent injury. Indeed, defendant reported she was not in pain at all.

## II.    Procedural Background

On October 30, 2018, a grand jury indicted defendant for attempted premeditated murder (§§ 187, subd. (a), 664, subd. (a)). The indictment further alleged that defendant had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and had personally inflicted great bodily injury (§ 12022.7). The People proceeded by way of grand jury because defendant had repeatedly refused to come to court for the preliminary hearing.

At her second court appearance on November 26, 2018, the trial court granted defendant's request to represent herself. The court appointed standby counsel.

After the trial court continued the matter several times at defendant's request,[2] the matter proceeded to a jury trial. Midway through the People's case, defendant relinquished her right of self-representation and standby counsel took over. The court instructed the jury on the crime of attempted murder as well as the special finding of premeditation, and on the lesser included offense of attempted voluntary manslaughter due to imperfect self-defense.

---

[2]    The continuances are recounted in greater detail in Part II.B of the Discussion.

6

The jury found defendant guilty of attempted premeditated murder and found true the weapon and great bodily injury enhancements.

After the trial court denied defendant's motion for a new trial on the basis of newly discovered evidence, the trial court sentenced defendant to prison for life with the possibility of parole plus six years (calculated as high-term of five years for the weapon enhancement plus one year for the great bodily injury enhancement).

Defendant filed this timely appeal.

## DISCUSSION

### I.     Instructional Issues

Defendant argues that the trial court made two instructional errors.  We independently review the jury instructions.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

**A.     *Failure to instruct on the lesser included offense of attempted voluntary manslaughter due to heat of passion***

Defendant argues that the trial court had a sua sponte duty to instruct the jury on the lesser included offense of attempted voluntary manslaughter due to heat of passion.

A trial court has a duty to instruct a jury on ""all general principles of law relevant to the issues raised by the evidence,""" including on any """lesser included offenses.""" (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)  Attempted voluntary manslaughter due to heat of passion is a lesser included offense to attempted murder (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241 (*Speight*)), and rests on a finding that the defendant—both subjectively and reasonably—committed her crime "while under 'the actual influence of a strong passion' induced by [the victim's]

7

provocation." (*People v. Moye* (2009) 47 Cal.4th 537, 550; accord, *People v. Nelson* (2016) 1 Cal.5th 513, 539.) This occurs when the defendant's "reason ""was obscured or disturbed by passion"" to so great a degree that an ordinary person would ""act rashly and without deliberation and reflection."""" (*People v. Vargas* (2020) 9 Cal.5th 793, 828 (*Vargas*).)

We need not decide whether the trial court erred in not instructing the jury on the lesser included offense of attempted voluntary manslaughter due to heat of passion because its omission was harmless beyond a reasonable doubt. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Here, the jury's finding that defendant's attempted murder was willful, premeditated and deliberate necessarily decided that defendant did *not* act under the "actual influence of a strong passion," and hence did not commit the crime of attempted voluntary manslaughter due to heat of passion, thereby rendering harmless the absence of an instruction for this crime. The jury instruction in this case defining when an attempted murder is willful, premeditated and deliberate (CALCRIM No. 601) states that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated." This is the antithesis of ""act[ing] rashly and without deliberation"""" (*Vargas, supra*, 9 Cal.5th at p. 828.) Thus, as the weight of precedent agrees, a jury's finding that a murder or attempted murder was willful, premeditated and deliberate is "manifestly inconsistent with

8

having acted under the heat of passion" and thus renders harmless the failure to instruct on a lesser included offense resting on a heat-of-passion finding.  (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1071-1072 (*Wang*); *People v. Franklin* (2018) 21 Cal.App.5th 881, 894-895 (*Franklin*); *People v. Peau* (2015) 236 Cal.App.4th 823, 831 (*Peau*); *Speight, supra*, 227 Cal.App.4th at p. 1246.)

Defendant resists this conclusion with three arguments.

First, she argues that instruction at issue in *Wang* (CALJIC No. 8.20) defined the terms "willful," "deliberate" and "premeditated" differently than the instruction at issue here (CALCRIM No. 601) because the CALJIC No. 8.20 instruction applicable to murder (as well as the CALJIC No. 8.67 instruction applicable to attempted murder) explicitly use the phrase "heat of passion" when they specify that a homicide is not "deliberat[e] and premeditat[ed]" if the defendant formed her "intent to kill" "under a sudden heat of passion or other condition precluding the idea of deliberation."  (CALJIC Nos. 8.20, 8.67.)  This is true, but irrelevant:  *Franklin* held that the CALCRIM No. 601 instruction given in this case also renders harmless the absence of a heat-of-passion-based lesser included offense (*Franklin, supra*, 21 Cal.App.5th at pp. 894-895), and, more to the point, the absence of the words "heat of passion" from the CALCRIM No. 601 instruction does not eliminate the "manifest[] inconsisten[cy]" between the jury's finding under the CALCRIM No. 601 instruction that defendant did not act "rashly" or "impulsively" and the finding of acting "rashly" that a jury would need to make to support a conviction of attempted voluntary manslaughter due to heat of passion.

Second, defendant argues that *Wang*, *Franklin*, *Peau* and *Speight* are all wrongly decided. She insists that we must follow *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 (*Ramirez*), which cited our Supreme Court's decision in *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), for the proposition that a jury's determination of guilt for first degree murder based on premeditation does not render harmless "the erroneous omission of an instruction on heat of passion voluntary manslaughter." Because *Berry* is binding precedent, defendant concludes, we must follow it and reject *Wang*, *Franklin*, *Peau* and *Speight*. However, defendant ignores that a post-*Berry* Supreme Court decision, *People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*), holds that a "state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." *Berry* and *Wharton* point in different directions, and we side with the majority of courts in concluding that *Wharton* applies here.

Lastly, defendant argues that following *Wang* and other cases impermissibly shifts the burden of proof to her in violation of due process. This argument is frivolous. What renders the assumed instructional error in this case harmless is *the jury's finding beyond a reasonable doubt* that defendant acted in a willful, deliberate and premeditated fashion. The People had the burden of proving that allegation. That the logical implication of that finding is that any error in not instructing on the lesser included offense at issue here was harmless does not in any way, shape or form shift the burden of proof, which always rested with the People.

**B.** *Misinstruction on the deadly weapon enhancement*

Defendant argues that the trial court erred in instructing on the enhancement for personal use of a deadly weapon.

In pertinent part, the court instructed the jury that a deadly or dangerous weapon is "any object, instrument, or weapon [(1)] *that is inherently deadly or dangerous* or [(2)] one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." (Italics added.) Because the sole weapon at issue in this case was a knife, and because a knife is not an inherently deadly weapon as a matter of law, the People concede that the trial court erred in instructing the jury that a knife could be an "*inherently* deadly or dangerous" weapon. (*People v. Aledamat* (2019) 8 Cal.5th 1, 5-8 (*Aledamat*).)

However, this error was harmless. In *Aledamat*, our Supreme Court clarified that the exact instructional error at issue here was effectively no different than an error in "misdescri[bing] . . . the elements" of a crime or enhancement, and thus was subject to harmless error analysis. (*Aledamat*, *supra*, 8 Cal.5th at pp. 9-10.) When an instruction omits or misdescribes an element, we assess whether that error was harmless beyond a reasonable doubt by asking whether "the omitted [or misdescribed] element was uncontested and supported by overwhelming evidence." (*Neder v. United States* (1999) 527 U.S 1, 17; accord, *People v. Mil* (2012) 53 Cal.4th 400, 409.) Here, the instructional error was harmless beyond a reasonable doubt because defendant did not contest—and the evidence was overwhelming—that the kitchen knife she used to stab Hardman repeatedly was "used in such a way that it [was]

11

capable of causing and likely to cause death or great bodily injury."

Defendant makes two arguments in response. First, she asserts that *Aledamat*'s resort to harmless error analysis is inapplicable to specific intent crimes like attempted murder. This assertion misses the mark because the error here pertained to the enhancement for the use of a dangerous or deadly weapon, and that enhancement requires only general intent. Second, she seems to contend that the error was not harmless because she stabbed Hardman after he pushed her away from the front door of the studio unit. This contention also misses the mark because defendants' proffered justification for using the knife does not speak to whether she used it in such a way as to cause death or inflict great bodily injury.

## II. Denial of Midtrial Continuance

Defendant argues that the trial court erred in denying her request for a one-day continuance after the People had rested its case and in denying her motion for a new trial asserting the same alleged error. We review the denial of a continuance request for an abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118 (*Mungia*).) Where, as here, the continuance is requested in the middle of trial, the trial court's discretion is "'substantial,'" such that "'appellate challenges'" to midtrial continuance rulings "'are rarely successful.'" (*People v. Wilson* (2005) 36 Cal.4th 309, 352, quoting *People v. Seaton* (2001) 26 Cal.4th 598, 660.)

### A. *Pertinent facts*

From the time defendant exercised her right of self-representation in November 2018 to the first day of trial on June 18, 2019, defendant requested—and was granted—several

12

continuances of the trial date to give her ample time to prepare for trial.

Once trial began on June 18, 2019, defendant engaged in a campaign of conduct designed to further postpone or to derail the trial. On June 18, she asked for a 90-day continuance, which the court denied.

Jury selection occupied all day June 19 and June 20, and the morning of June 21.

The People began presenting its case-in-chief during the afternoon of Friday, June 21.

The People were unable to continue their case-in-chief on Monday, June 24 because defendant refused to leave her jail cell that morning. The court issued an extraction order, which prompted defendant to relent and agree to come to court. However, she did not arrive in court until 2:50 pm. Although defendant attributed her refusal to come to court to medical issues, when she was transported to a medical facility after court that afternoon, she refused to answer any questions about her health. The court was forced to order the jury—which had been waiting around all day—to return the next morning.

On the morning of June 25, defendant told the trial court she no longer wished to represent herself. The court then ordered defendant's standby counsel to take over defendant's representation. Standby counsel immediately asked for a continuance of "at least 10 days" to try to get defendant's mental health records from Kaiser and to subpoena a mental health counselor defendant had consulted in April 2017. The court denied that continuance request. The People resumed its case-in-chief for the balance of the morning. After the People put on its last witness in the afternoon and rested, the court recessed for

13

the remainder of the afternoon to give standby counsel the opportunity to marshal whatever defense he wished to present.

On the morning of June 26, standby counsel asked for a one-day continuance so that he could call as a witness the mental health counselor whom defendant had consulted after defendant's mid-April encounter with Hardman but before the May 6 stabbing. Standby counsel proffered that the counselor would testify that defendant had reported being the victim of domestic violence in mid-April. The trial court denied the continuance on the grounds that (1) defendant had not previously identified this counselor as a witness when asked to list her anticipated witnesses, and (2) the counselor's testimony regarding domestic violence would not be relevant "unless there's evidence that [defendant] is the victim of domestic violence" and defendant had opted not to testify. Defendant called one character witness, and then rested.

### B. *Analysis*

A continuance in a criminal case may only be granted for good cause. (§ 1050, subd. (e); *Mungia*, *supra*, 44 Cal.4th 1101, 1118.) When a defendant requests a continuance in the middle of trial, she must as a threshold matter "'show [s]he exercised due diligence in preparing for trial.'" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1106 (*Fudge*), quoting *People v. Danielson* (1992) 3 Cal.4th 691, 705; *People v. Winbush* (2017) 2 Cal.5th 402, 469-470.) If that threshold showing is made, then the trial court must evaluate whether good cause justifies the continuance by examining (1) how the defendant will benefit from the continuance, (2) the likelihood that benefit will come to pass, (3) the burden of the requested continuance on other witnesses, the jurors, and the court, and (4) whether the requested continuance

14

would further or undermine substantial justice. (*People v. Panah* (2005) 35 Cal.4th 395, 423.)

The trial court did not abuse its discretion in denying defendant's midtrial request for one-day continuance for two reasons.

First, defendant did not meet her burden of showing that she had exercised due diligence in preparing for trial. During the seven months defendant represented herself, the trial court repeatedly asked her if she wished to continue representing herself, repeatedly advised her of the importance of being prepared for trial, and repeatedly asked defendant to identify which witnesses she intended to call. The mental health counselor was not one of the witnesses defendant identified, even though defendant had consulted the counselor prior to the charged crime and was obviously aware of her meeting with that counselor. Although *standby counsel* did not evince any lack of diligence, the trial court had repeatedly warned defendant that standby counsel would have to "rely[] on [defendant's] workup of the case" should she relinquish her right of self-representation. Defendant's decision not to prepare for trial notwithstanding the trial court's prescient advisements means that defendant was aware of the risks arising from her lack of preparation and nevertheless chose to take them. (See *Fudge, supra*, 7 Cal.4th at p. 1107 [denial of continuance appropriate where "the record shows that defense counsel had been warned repeatedly by the trial court to have their defense ready"].)

Second, the trial court did not abuse it discretion in balancing the pertinent factors and concluding that defendant had not otherwise established "good cause" for the midtrial continuance sought by standby counsel. The counselor's

15

testimony was unlikely to appreciably benefit defendant because the jury had already heard defendant's statements on the 911 calls as well as her pre- and postattack statements to police claiming that Hardman had previously abused her. Evidence that defendant had also repeated that account of events to a counselor adds very little. Defendant urges that the counselor would have testified that defendant showed her a bruise, but this evidence was not shared with the trial court until defendant's *new trial* motion (and thus was not part of the trial court's calculus in denying a continuance) and also adds very little because it is dependent upon the jury crediting defendant's explanation to the counselor about the source of the bruise. There is no question that further continuing the trial would have inconvenienced the jurors, who had already suffered through one wasted day and one abbreviated day of trial due to defendant's "antics" and "delay" "tactic[s]." In light of these considerations, delaying the trial further would have undermined—rather than furthered—"substantial justice."

Defendant offers two further arguments in support of her position that denying her the continuance was error. She asserts that no witnesses would have been inconvenienced because the People had rested its case-in-chief by the time standby counsel asked for the continuance, but this ignores the inconvenience to the jurors. Defendant also contends that the counselor's recounting of defendant's statements to her would have been admissible under the rules of evidence, but that recounting—even if admitted—would have added almost nothing to the body of evidence already before the jury.

16

## III. Failure to Conduct a Second Competency Trial

Defendant argues that the trial court erred in not declaring a second doubt about her competency to stand trial. We review a trial court's determination of competency for substantial evidence. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797 (*Blacksher*).)

### A. *Pertinent facts*

In late 2017 (before defendant was indicted), defendant's attorney raised a doubt about defendant's competency, the trial court declared a doubt, and defendant's competency was evaluated. The mental health court found defendant to be competent to stand trial.

Nearly two years later, at a pretrial hearing on May 1, 2019, defendant—while representing herself—asked the trial court if she could be sent back to the mental health court to evaluate her competence because, in her view, the Sheriff's Department had said she was not competent. The court responded that the Sheriff's Department had not raised any doubt about defendant's competence; instead, the Department had placed her on suicide watch. The court further stated that it had "not seen one iota of anything . . . any of the times [defendant had] come before this court to suggest that [defendant was] incompetent." Defendant also informed the court that she "absolute[ly]" "fe[lt]" "competent to represent [her]self."

In the middle of trial, after defendant had relinquished her right of self-representation, the court asked standby counsel and defendant whether defendant intended to testify. Standby counsel relayed that defendant "doesn't feel comfortable testifying absent discussing this with a therapist." When asked to explain, defendant elaborated that she "would feel more

17

comfortable if [she] was evaluated by [a] mental psych[ologist] before [she got] on the stand" because she "want[ed] to make sure [she was] mentally sound, [that she was] okay, and [that she] won't break down" when going "through the trauma" of testifying.

**B.** *Analysis*

As a matter of due process, a criminal defendant may not be tried or convicted while mentally incompetent. (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*); *People v. Sattiewhite* (2014) 59 Cal.4th 446, 464 (*Sattiewhite*); *Pate v. Robinson* (1966) 383 U.S. 375, 384-386.) For these purposes, a defendant is mentally incompetent if she (1) "'"lacks a '"sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding"'"'" of the proceedings against her, or (2) lacks "'"'"a rational as well as a factual understanding of the proceedings against [her].'"'"'" (*Sattiewhite*, at p. 464, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402; *Rodas*, at pp. 230-231.) A trial court is required to suspend criminal proceedings and conduct a full competency trial if substantial evidence, even if conflicting, raises a reasonable doubt regarding the defendant's mental competence. (§ 1368, subds. (a) & (b); *People v. Lightsey* (2012) 54 Cal.4th 668, 691; *People v. Welch* (1999) 20 Cal.4th 701, 737-738.) Where, as here, a defendant has already been found competent to stand trial after a competency hearing, "a trial court may rely on that finding [going forward] unless the court "'is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.'" (*Rodas,* at p. 231 quoting *People v. Jones* (1991) 53 Cal.3d 1115, 1153.) Because a defendant is presumed to be competent, the burden rests with the defendant to establish the requisite substantial change of circumstances or

18

new evidence casting a serious doubt on the prior finding of competence.  (See *Blacksher*, *supra*, 52 Cal.4th 769, 797.)

Defendant did not carry her burden.  She points to two events that, in her view, constitute a "change of circumstances or new evidence casting a serious doubt" on her competency—(1) the fact she was placed on suicide watch on May 1, 2019, and (2) her request to consult with a therapist before taking the stand in her own defense.  However, neither casts a serious doubt on the validity of the prior finding of competence.  Suicidal ideation may be enough to raise a doubt about one's competence if it is combined with other factors and if there has been no prior finding of competency.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 848; *People v. Johnson* (2019) 21 Cal.App.5th 267, 276.)  But here, there are no other factors and there was a prior finding of competency.  And defendant's desire to consult with a therapist to make sure she did not "break down" on the stand in view of jury does not evince a lack of present ability to consult with her lawyer *or* a lack of rational, factual understanding of the proceedings.  To the contrary, defendant's concern about how she might appear to the jury evaluating her fate is proof that she was keenly aware of what was going on and what was at stake.  This concern, coupled with defendant's ability to conduct voir dire and cross-examine the People's witnesses during the first half of the trial, provided the trial court with an ample basis to conclude that nothing had changed after the first competency hearing.  Indeed, the trial court was also well within its discretion to view defendant's long history of requesting multiple continuances, of misconduct while in custody, and of feigning medical issues during trial as part of an overall stratagem of "playing games" in order to "delay the proceedings as long as [she] can," a goal that

19

evinces—and *presupposes*—a full appreciation and understanding of the events happening around her.

Defendant responds with three arguments. First, she argues that her placement on suicide watch automatically entitles her to a second competency hearing. As noted above, it does not. Second, she argues that Hardman's testimony before the grand jury that defendant was "sort of degrading mentally" prior to the May 2017 incident attests to her lack of competence to stand trial. This is triply irrelevant: Hardman's opinion is, at most, a lay opinion; his opinion spoke to her competence in general, not to the particularized lack of competence to assist counsel and understand legal proceedings; and his opinion pertained to defendant's mental state in early 2017—long *before* the mental health court found her to be competent to stand trial. Lastly, defendant argues that her standby counsel expressed a doubt about her competency when he started to say "My client advises me as far as her competency and her ability—" before the trial court cut him off and reminded him not to relay client confidences. Standby counsel then stated that defendant did not "feel comfortable testifying absent discussing this with a therapist." Thus, standby counsel never declared a doubt; he relayed defendant's preference to meet with a therapist before testifying which, as we have explained, does not constitute a change of circumstance or new evidence casting serious doubt on the prior finding of her competency.

## IV. Diversion

Defendant argues that this matter should be remanded to the trial court for the court to exercise its discretion under section 1001.36 to "grant pretrial diversion" to persons who "ha[ve] been diagnosed with a mental disorder" that was a "significant factor

20

in the commission" of the charged crime(s). (§ 1001.36, subds. (a) & (b).) Because section 1001.36 became effective *before* defendant was indicted, *before* she went to trial, *before* she was found guilty, *before* sentencing and *before* judgment was entered by the trial court, defendant's argument presents the question: Is a request for "pretrial diversion" under section 1001.36 timely when it is made for the first time on appeal? Our Supreme Court answered that question in *People v. Braden* (2023) 14 Cal.5th 791, 800, ruling that a request for diversion "must be made before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first." Because defendant did not request pretrial diversion within *Braden*'s time frame, her request is untimely.

## V.    Sentencing Error

For many years, the law gave the trial court "broad discretion to select among three terms and impose a sentence [or sentencing enhancement] that in its judgment served the interests of justice." (*People v. Lynch* (2024) 16 Cal.5th 730, 773 (*Lynch*).) Effective January 1, 2022, Senate Bill No. 567 amended the scope of this discretion. (Stats. 2021, ch. 731, § 1.3.) Sections 1170 and 1170.1 now provide, in relevant part, that where a statute specifies three possible terms of imprisonment for a crime or for a sentencing enhancement, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§§ 1170, subd. (b)(1), 1170.1, subd. (d)(1).) The middle term, therefore, is the presumptive determinate sentence under the amended law. (See *Lynch*, at p. 748.)

A court has discretion, however, to impose an upper term

sentence if certain aggravating factors,[3] aside from a defendant's prior convictions, are proven beyond a reasonable doubt to a jury or to a judge in a court trial, or stipulated to by the defendant. (§§ 1170, subds. (b)(2) & (b)(3), 1170.1, subd. (d)(2); *Lynch, supra*, 16 Cal.5th at p. 742.)  The court may nevertheless "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170, subd. (b)(3).)

In *Lynch*, our Supreme Court resolved a festering split of authority over how to assess whether a sentence imposed *before* Senate Bill 567 took effect (and which was not yet final) was to be evaluated for harmlessness.  After holding that a trial court's noncompliance with the newly enacted section 1170, subdivision (b) also violated the Sixth Amendment right to a jury trial, *Lynch* went on to hold that a trial court's imposition of an upper-term sentence based on its own findings (rather than the jury or stipulated findings called for by Senate Bill 567) was harmless error (and thus avoided remand for a new sentence) only if (1) "the reviewing court concludes beyond a reasonable doubt that a jury, applying that same standard, would have found true *all* of the aggravating facts upon which the [trial] court relied to conclude the upper term was justified" and (2) "the record" "clearly indicate[s] that the [trial] court would have found an upper term justified had it been aware of its more limited discretion" under Senate Bill 567.  (*Lynch, supra*, 16 Cal.5th at pp. 742-743, 773, 775.)

---

[3]     California Rules of Court, rule 4.421 provides a non-exhaustive list of aggravating sentencing factors that may be used to increase a defendant's sentence to the upper term under section 1170, subdivision (b).

In imposing the high term of five years on the great bodily injury enhancement, the court explicitly cited "multiple factors in aggravation"—namely, (1) "the manner in which [the attempted murder] was carried out does indicate planning[ and] sophistication" (see Cal. Rules of Court, rule 4.421(a)(8) [aggravating factor includes that "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism"]), and (2) the crime was "particularly callous" and "cruel[]" (see *id.*, rule 4.421(a)(1) [aggravating factor includes that the "crime . . . or other acts disclos[ed] a high degree of cruelty, viciousness, or callousness"]). The court explained that the crime involved planning and sophistication because defendant had called a therapist in advance of the crime to report that Hardman had inflicted domestic violence upon her (to "mak[e] a record" that would set up a domestic violence-based justification for the homicide), she had "lure[d]" Hardman to her apartment on a pretext, she had asked Hardman to leave and come back so she could make the non-emergency call to the police department reporting domestic violence, and then, when he returned, she had stabbed him in the back and then the chest. The court explained that the crime was callous and cruel because, after stabbing Hardman and seeing him "lying on the floor bleeding out[ and] asking for help," defendant "ma[de] demands"—namely, that he kiss her and tell her that he loved her while *pretending* to call 911—"to satisfy her own sick personal needs." The court cited one "mitigating factor"— namely, that defendant had no prior criminal record (*id.*, rule 4.423(b)(1)). The court found that these aggravating circumstances "far outweigh[ed]" the mitigating circumstance.

It is undisputed that the trial court did not comply with the

23

as-yet-enacted section 1170.1 when imposing the high term because only one of the aggravating factors it cited in support of the high term for the enhancement was found by a jury or admitted by the defendant:  The jury found that first aggravating factor (that the crime involved premeditation), but not the second (that the crime was cruel and callous).  Under *Lynch*, this constitutes both a statutory and constitutional violation, and can be found harmless only if we conclude (1) that a jury would have found the cruel and callous factor to be true beyond a reasonable doubt and (2) the record clearly indicates that the trial court would have imposed a high term for the sentencing enhancement had it been aware of the presumption against doing so imposed by the new section 1170.1.

We conclude that the trial court's error was harmless in this case.  Although the characterization of a crime as "callous" and "cruel" is subjective to some extent, which can accordingly make it more "difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court" (*People v. Sandoval* (2007) 41 Cal.4th 825, 840, superseded on other grounds by § 1170, subd. (b)), that difficulty is not present here.  Here, the evidence showed that defendant toyed with Hardman while he lay dying, refusing to call 911 for medical help for the stab wounds *she* inflicted due to feeling jilted while she "demanded a kiss . . . and to be told that she was loved" by Hardman; we conclude that a jury would have found such conduct to be "callous" and "cruel" beyond a reasonable doubt.

What is more, the record clearly indicates that the trial court would have imposed the high term for this enhancement had it been aware of the presumption favoring the middle term.

24

*Lynch* held that such a clear indication typically entails "definitive" statements by the trial court. (*Lynch*, *supra*, 16 Cal.5th at p. 277.) *Lynch* itself provided two examples of such "definitive" statements—namely, (1) where a trial court found the defendant to be "'"deserving [of] the ultimate sentence of death,"' [the] trial court observed that the defendant was "'the worst of the worst,"' that he "'show[ed] absolutely no remorse"' and that "'[i]t's as if he has no soul"'" (*Ibid.*, citing *People v. Flores* (2020) 9 Cal.5th 371, 432); and (2) "where 'the sentencing court announces that it is aware of forthcoming legislation and then explains how it would exercise its discretion under that legislation'" (*Lynch*, at p. 777, citing *People v. Salazar* (2023) 15 Cal.5th 416, 431). The record here contains such definitive statements. The trial court repeatedly emphasized defendant's efforts to set up in advance a domestic violence justification for killing Hardman, her near-fatal attack, and her post-attack toying with Hardman—which would have cost Hardman his life had it not been for the "amazing medical treatment" he received. The court referred to defendant as "nothing but a willful, deliberate, and premediated murderer who failed." The court also resoundingly rejected defendant's plea that *she* was the victim of domestic violence, going so far as to address a hypothetical "future Governor":

> "There was no domestic violence perpetrated upon [defendant] in case she wants to go to the Department of Corrections, which is where she'll go to for a long time, and suggest to them that she's the victim of domestic violence, and some future Governor should let her go, let me be very clear, read the trial transcripts, read the evidence, Governor, read the facts of this case. There is no domestic violence perpetrated upon

[defendant].  She is a willful, deliberate and
premeditated murderer that failed."

The court also noted that the aggravating circumstances "*far*
outweighed" the sole mitigating circumstance.  In our view, this
language clearly indicates the trial court's view that defendant
deserves the harshest sentence—and that future attempts to
wriggle out of that sentence should be rejected.

Finally, defendant also briefly argues for remand due to an
additional change in the determinate sentencing law.  Section
1170, subdivision (b)(6) provides that "unless the court finds that
the aggravating circumstances outweigh the mitigating
circumstances that imposition of the lower term would be
contrary to the interests of justice," the court shall impose the
lower term if one of several factors was a "contributing factor in
the commission of the offense."  One of those factors is
"psychological . . . trauma, including but not limited to, abuse,
neglect, exploitation, or sexual violence."  (§ 1170, subd. (b)(6)(A).)
Defendant urges that she "may have suffered a psychological
trauma" because she had been "sort of degrading mentally" in the
months before the crime, as shown by the facts that (1) she
became more forgetful and "a lot more hostile," (2) she met with
the therapist prior to the crime and had an "anxious mood," (3)
she was "undergoing two [of the] most stressful events that any
person experiences"—a break-up and a move, and (4) defendant
was in late 2017 examined for her competency to stand trial (and
found competent).  We doubt that defendant has established the
requisite trauma:  Her competency to stand trial is a wholly
separate question, and being forgetful, moody, hostile, and
dealing with general life stressors does not rise to the ilk of
"abuse, neglect, exploitation, or sexual violence."  But even if we

26

assume defendant had suffered some psychological trauma (and that this trauma had some relationship to the crime in this case), the trial court in this case already sufficiently explained why a lower term sentence on the enhancement would not be in the interests of justice; remand would be pointless.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.\*

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ

---

\* Presiding Justice of Division Five of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.